Paul PLUMMER, Plaintiff,

v.

William BOLGER, Defendant.

Civ. A. No. 81–2464.

United States District Court,
District of Columbia.

March 2, 1983.

Joel Bennett and Bennett, Deso, Greenberg & Thomas, Washington, D.C., for plaintiff.

Mitchell R. Berger, Asst. U.S. Atty. for the District of Columbia, Washington, D.C., for defendant; with whom Stanley S. Harris, U.S. Atty., and Royce Lamberth, Asst. U.S. Atty., Washington, D.C., Susan R. Klavens, U.S. Postal Service, Washington, D.C., were on brief.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CHARLES R. RICHEY, District Judge.

This is an action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16. The case was tried to the court, sitting without a jury, and was presented in perhaps as able a manner as this Court has ever witnessed. Counsel for *both* sides are to be commended for their absolutely outstanding work. Indeed, the quality of their efforts has made decision in this case exceedingly difficult. It is, however, the Court's duty to choose between the two sides, and accordingly, the Court hereby enters its findings of fact and conclusions of law, holding for the defendant.

## I. FINDINGS OF FACT

Plaintiff, Paul Plummer, is a white male of Irish national origin, who has been employed with the United States Postal Service since 1968. He is suing defendant, the Postmaster General of the United States, in an official capacity, for discrimination he alleges occurred in his employment. He alleges discrimination on the basis of race, sex, color, reprisal, and national origin. During the period in question here, all of plaintiff's immediate supervisors were black.

Plaintiff's difficulties with the Postal Service began in 1975 after he was promoted from the position of Distribution Clerk at the Main City Post Office, Washington, D.C., to the supervisory position of Foreman, Mails. Following his promotion, plaintiff was assigned to the Registry Section, where he became involved in verbal and physical altercations with postal employees under his supervision on several occasions. As a result of these altercations, plaintiff received, first, a written advisement on his reference card,[1] second, a disciplinary counseling, and finally, in January, 1976, was demoted from Foreman back to the position of Distribution Clerk.

It was after this incident that plaintiff filed the first of what proved to be a seemingly endless string of E.E.O. complaints, ten of which are in issue here. A final administrative decision on the first complaint held that defendant had not discriminated against plaintiff. Indeed, final administrative decisions on *all* of plaintiff's complaints have found no discrimination against plaintiff.

Following his reduction in position, plaintiff was assigned to work in areas of the Post Office other than Registry, where two of his altercations with employees had taken place. Utilizing rights granted to him by a nationwide collective bargaining agreement, however, plaintiff subsequently bid on and obtained an assignment back to

Registry. Evidence was introduced at trial suggesting that plaintiff sought to return to Registry in order to prove he could not be pushed around, although plaintiff claimed that he did so in order to ensure himself of security in shift assignment.

After plaintiff returned to Registry, he was involved in another series of incidents, about which he also filed E.E.O. complaints. The first of these incidents occurred on July 2–3, 1978, when plaintiff worked four hours of overtime before and four hours of overtime after his scheduled eight hour shift, for a total of 16 consecutive work hours. City Post Office policy prohibits any employee from spending more than 12 consecutive hours on the job. On July 9, when Superintendent of Registry, Frederick J. Campbell, learned of plaintiff's violation of this policy, he directed Foreman Leon Miller to instruct plaintiff not to work any overtime at the end of his shift that night. Miller thereupon instructed plaintiff not to remove his timeclock punch-card from Registry at the end of his scheduled work shift without the approval of a Registry supervisor. Nonetheless, at the end of his scheduled work shift that day, plaintiff did take his time card from Registry without approval from a Registry supervisor and proceeded to work an additional four hours of overtime in another area of the Post Office. The next day, Superintendent Campbell personally instructed plaintiff not to work more than 12 consecutive hours at any time. When plaintiff demanded to see some written expression of the 12-hour rule, Campbell arranged to have a non-disciplinary, written advisement placed on plaintiff's reference card reiterating the rule. Also, on July 14, Foreman Miller recommended that plaintiff receive a 7-day disciplinary suspension for violating his instruction not to remove the time card without permission.

Before the 7-day suspension was made final, however, several additional incidents transpired between plaintiff and Foreman

---

1. A "reference card" is a record maintained by City Post Office management officials which provides, with respect to each employee, a record of attendance, commendations, discipline and other personnel data. It is available for review both by an employee and by his supervisor.

Miller. On July 16, while Miller was securing forms necessary to excuse plaintiff from Registry to the medical unit of the Post Office, plaintiff spoke to him in an abusive manner and, in the presence of others, repeatedly called Foreman Miller incompetent. In response, Miller gave plaintiff a disciplinary counseling. Again on July 23, plaintiff directed remarks to Foreman Miller that were disruptive of the workplace. Then, on July 30, plaintiff again scoffed at Foreman Miller's instructions. On that occasion, Miller had approached several Registry employees individually and directed each to proceed to another work station. Each employee complied immediately except for plaintiff who had to be instructed repeatedly and in the presence of a higher level supervisor before he complied. Thereafter, Foreman Miller delivered to plaintiff a notice of suspension for 14 instead of 7 days. The notice cited plaintiff's failure to follow official instructions on July 9 and July 30, his disruptive conduct on July 23, and also a deviation from his assigned lunch schedule on July 26, when he had returned from lunch several minutes early. Plaintiff challenged his suspension and Foreman Miller's disciplinary counseling of July 16 in two separate administrative complaints, both of which were heard and rejected by the EEOC as not premised on discrimination or reprisal.

On August 15, 1978, plaintiff filed another administrative complaint charging that he was not assigned a fair proportion of armed convoy duty (an assignment he preferred) and was forced to listen to black-oriented music played on a private radio in the Registry section. Both parties have stipulated that, for the period of March through June 1978, the distribution of convoy assignments among Registry employees was as follows:

| | Black Females | Black Males | White Male [2] |
|---|---|---|---|
| March | 4 per employee | 2.2 per employee | 3 |
| April | 3.6 per employee | 2.2 per employee | 6 |
| May | 3 per employee | 2.2 per employee | 1 |
| June | 3.4 per employee | 1.5 per employee | 3 |

2. Plaintiff was the only white male in the Registry unit who had obtained the firearms permit

Although an EEOC hearing examiner proposed a finding of discrimination against plaintiff in the assignment of convoy duty, based on statistics from only May and June of 1978, a final agency decision found no discrimination based on these complete statistics from the four months, March through June. As to the use of the private radio, plaintiff alleges that this was contrary to a directive by the Postmaster. However, Registry Superintendent Campbell testified that he had obtained permission for it because Registry, unlike other areas of the Post Office, did not receive piped-in music through a loud-speaker system. He and Foreman Miller further testified that the majority of Registry employees favored having the radio there and the stations selected to be played on it, and this testimony was uncontroverted. The EEOC also found no discrimination against plaintiff in connection with the playing of the radio.

The next series of incidents began when, on September 5, 1978, plaintiff found a small first-class mail package in a piece of postal equipment. Plaintiff delivered the package to Supervisor Earl Dailey and requested that this discovery be noted for plaintiff's record. After Dailey did not do so, plaintiff filed a formal complaint charging Dailey with race and sex discrimination. Similarly, plaintiff filed an administrative complaint when Supervisor William Warren did not note on plaintiff's record that he had found 44 pieces of excess mail on a conveyor belt where they did not belong. The EEOC found that defendant had neither discriminated against plaintiff nor acted in reprisal in either of these incidents.

Next, plaintiff filed a complaint when he discovered in December, 1978 that firearms permits for several of his co-workers had been renewed, whereas his own permit had been allowed to expire. The Postal Service had previously issued such permits to enable employees performing convoy duty to

needed to perform convoy duty.

carry weapons. Before plaintiff's permit had lapsed, however, defendant had determined to transfer most of the convoy work to a special security force. Consequently, Registry officials reduced the number of permits issued by allowing many to lapse, including plaintiff's. The EEOC found no discrimination or reprisal against plaintiff in connection with the lapse of his firearms permit.

Plaintiff's next complaint arose out of a confrontation he had with Registry Supervisor Ludie Johnson, to whom he went to complain about the actions of a co-worker. In the presence of eight of plaintiff's black co-workers, Johnson responded to plaintiff in a manner that plaintiff found insulting. There was testimony, however, that Johnson had made similarly strong remarks to black as well as white employees. The EEOC found no support for plaintiff's allegation of discrimination in this matter.

Plaintiff again complained when, on February 19, 1979, he was not given permission to work more than 12 consecutive hours. Because of a major snowstorm that day, and an ensuing shortage of workers, employees in the DataSite area of the Post Office were allowed to exceed the 12-hour limit on consecutive hours. Registry Superintendent Campbell decided that this was not necessary in his area because the mail did not have to go out immediately. He also testified that plaintiff did not ask for special permission to work over 12 hours that day. The EEOC found no support for plaintiff's administrative complaint with respect to this incident. Nor did the EEOC find support for plaintiff's complaint of April 24, 1979 in connection with the selection of a radio station. He had complained that Supervisor Ludie Johnson honored the request of a black female employee for the selection of a particular station, whereas his own previous requests for the selection of a different station had been rebuffed. Plaintiff admitted, however, that the station he did not want to listen to was the choice of a majority of Registry employees.

The next incident in which plaintiff was involved was perhaps the most serious, certainly insofar as plaintiff's discipline was concerned. On April 11, 1979, Registry Supervisor Earl Dailey instructed plaintiff to change his work station and to begin opening pouches of incoming mail. Dailey issued the same instructions to another clerk, who complied immediately. Plaintiff, however, continued performing the task in which he had been engaged. Accompanied by another Supervisor, Dailey again instructed plaintiff to begin opening mail. Plaintiff responded by asking in a loud voice whether Dailey was speaking to him. Dailey then instructed plaintiff to accompany him and Supervisor Johnson to an office off the workroom floor. Once there, Dailey told plaintiff that he had failed to follow official instructions. Plaintiff denied having heard the instructions, blaming this on the volume of the "black racist radio" playing in the workroom. After Dailey again instructed plaintiff to open mail pouches, plaintiff proceeded to a conveyor belt and began emptying the mail onto the middle of the belt. This was an improper procedure, which plaintiff undertook even though, at that point, he had some three years of experience with proper Registry procedures.

Based on reports of this incident, forwarded to him by Dailey and Johnson, Supervisor William Warren recommended plaintiff's removal from the Postal Service on a charge of "failure to comply with official instructions." Taking into account plaintiff's past disciplinary record, defendant issued a notice of removal to him on May 23, 1979. Plaintiff challenged this removal through both a contract grievance procedure and a formal EEO complaint. The contract grievance procedure resulted in a finding by the Arbitrator that plaintiff:

> willingly failed to obey proper instructions of supervision on April 11, 1979. The Arbitrator also finds that Grievant was loud, uncooperative and disruptive on that date. The Arbitrator holds that discipline was warranted and that it was proper to consider Grievant's prior record in imposing discipline.

Defendant's Exhibit 21, at 5. However, because 42 days had elapsed between the time of the incident and the notice of removal issued to plaintiff, the Arbitrator found a "due process violation" which, together with the severity of the sanction of discharge, led him to reduce the removal to a suspension. The Arbitrator directed that the time that had elapsed should be treated as a disciplinary suspension and that plaintiff should not receive back pay.

In his simultaneous EEO complaint, plaintiff not only challenged his removal, but also complained that he had received no safety talks for a four month period and that black employees exercised greater control than he did over Registry radio station selection. At the time of plaintiff's removal, removal was the next step in the system of progressive discipline used for employees of the Postal Service. He had already had a disciplinary counseling and a suspension of less than 30 days. Under the applicable collective bargaining agreement, the next step was indeed a "suspension of more than 30 days or discharge." See Defendant's Exhibit 24, Art. XVI. As to safety talks, both parties have stipulated that, during the challenged period, plaintiff was either not working or was absent from work on the days when half of these talks were given. The hearing examiner found no discrimination on all of plaintiff's administrative charges, and then went on to state that plaintiff "has shown that he is a person with a vendetta—and one who is abusing the EEO complaint processing system in pursuing it." This determination was affirmed by the Office of Review and Appeals.

The last complaint that is in issue here arose out of an incident on July 4, 1981, after plaintiff had returned to work. On that date, plaintiff was not allowed to work overtime despite the fact that he was on the "overtime desired" list. The "overtime desired" list, however, is not used in selecting employees to work on holidays like July 4. Under the applicable collective bargaining agreement, full-time regular employees who volunteer to work those days are allowed to work in order of seniority. More-over, despite the absence of any wrong to plaintiff, the Postal Service agreed to settle his contract grievance about the incident by paying him for eight hours of overtime work. Both the Postal Service and the EEOC treated plaintiff's subsequent complaint about this incident as moot, since plaintiff had been made whole. Nonetheless, plaintiff has sought to raise this claim here, because, he says, the supervisory personnel responsible should be personally held accountable.

## II. CONCLUSIONS OF LAW

The first inquiry, in all cases brought under Title VII, is whether plaintiff has met the initial burden of presenting a *prima facie* case of discrimination. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Here, plaintiff has alleged discrimination on a number of different grounds, and it is his burden to establish a *prima facie* case as to at least one of them. Specifically, he must establish a *prima facie* case of discrimination on the basis of race, of sex, of color, of reprisal, *or* of national origin.

The Court has already disposed of two of these grounds. In ruling on defendant's motion under Fed.R.Civ.P. 41(b) at the conclusion of plaintiff's case, the Court already held that plaintiff did not establish a *prima facie* case of discrimination on the basis of color or national origin. The Court found plaintiff's in-court suggestion that he was discriminated against because he was "pink" to be both incredible and plainly without support. Furthermore, although the Court indicated during the presentation of defendant's case that it might reconsider the dismissal of plaintiff's claim that he was discriminated against on the basis of national origin, the Court now concludes that reconsideration is unnecessary. Plaintiff was unable to establish at trial that any of his immediate supervisors even *knew* what his national origin was, let alone discriminated on the basis of it. Moreover, plaintiff's counsel acknowledged in court that the claims such as color and national

origin discrimination were included by plaintiff at the administrative level, where plaintiff was acting *pro se* because "he believed that if he did not claim every possibility he would be waiving [it] in the future." Thus, it appears that even plaintiff's counsel did not take plaintiff's claims of discrimination on the basis of color and national origin completely seriously.

■ Turning next to plaintiff's claims of race and sex discrimination, plaintiff has sought to establish a *prima facie* case on these grounds by reference to the standards articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). It should be noted, however, that plaintiff here is a white male, and thus his claims of race and sex discrimination constitute claims of "reverse discrimination." In *Parker v. Baltimore & Ohio Railroad Co.,* 652 F.2d 1012 (D.C.Cir.1981), the Court of Appeals for this jurisdiction indicated that the *McDonnell Douglas* standards are only appropriate for cases of reverse discrimination if "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Id.* at 1017. The Court of Appeals has not made clear precisely what such "background circumstances" may be, however. Some guidance can be gleaned from the case of *Daye v. Harris,* 655 F.2d 258 (D.C.Cir.1981), a case cited in *Parker,* wherein plaintiff demonstrated that 92% of the promotions in her division went to black nurses even though 32% of the nurses were white. In the instant case, plaintiff has not introduced this kind of evidence. Plaintiff did show that all of his immediate supervisors were black. Without more, however, that fact is not sufficient to show that defendant is "the unusual employer who discriminates against the majority." In the absence of such a showing, plaintiff must prove discriminatory motive by direct evidence. *Parker,* 652 F.2d at 1018. Plaintiff plainly has not done so here, and thus he has not satisfied his *prima facie* burden as to race and sex discrimination.

■ Indeed, even assuming that plaintiff could, by law, meet his *prima facie* burden on these claims through use of the *McDonnell Douglas* standards, the Court finds that, on each of his various claims of race and sex discrimination, he has either failed to do so or has failed to persuasively rebut defendant's legitimate, non-discriminatory explanation for its actions. In order to establish a *prima facie* case of discrimination in connection with disciplinary actions under the *McDonnell Douglas* approach, plaintiff must prove that either he did not engage in the conduct for which he was disciplined or, if he did, that employees not of his protected group who engaged in comparable acts were not punished in a similar fashion. *Green v. Armstrong Rubber Co.,* 612 F.2d 967, 968 (5th Cir.), *cert. denied,* 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980); *Sullivan v. Boorstin,* 484 F.Supp. 836, 842 (D.D.C.1980). If plaintiff can establish a *prima facie* case, defendant has the burden of articulating some legitimate, non-discriminatory justification for its actions. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252, 101 S.Ct. 1089, 1091, 67 L.Ed.2d 207 (1981). Once defendant has done so, the burden of persuasion devolves on plaintiff to prove that defendant's explanation is pretextual. *Id.*

Here, plaintiff has alleged that he did not engage in the conduct for which he was disciplined, and that, even if he did, he was disciplined more severely for it than black or female co-workers who engaged in similar conduct. As set forth above in the findings of fact, though, the Court has found that plaintiff did do the things for which he was disciplined, namely:

1. He did remove his time card from the Registry section and work more than 12 consecutive hours on two days in July, 1978, contrary to Post Office rules and to the specific instructions of his supervisor.

2. He did speak to his supervisor in an abusive and disruptive manner on two occasions in July, 1978.

3. Also in July, 1978, he did not comply promptly with his supervisor's instructions to move to another work station.

4. Most importantly, in April, 1979, he did not promptly comply with official instructions and then, when requested again to comply by two of his supervisors, undertook the requested activity in an improper manner, causing a further disruption of the workplace.

Since plaintiff did engage in these activities, the only real question is whether black or female employees who engaged in similar conduct were disciplined less severely. With respect to working more than 12 consecutive hours, plaintiff alleges that Fern Albert, a white female, also engaged in such conduct in July, 1978, and that she was not disciplined as severely therefor. Plaintiff also contends that a written "advisement" was not placed on her reference card, as it was on his, until he himself complained. In response, defendant notes that Fern Albert had not exceeded the 12-hour limit on hours prior to this incident, while plaintiff had already done so on July 2–3, 1978. Moreover, defendant points out that the *non*-disciplinary advisement that was placed on plaintiff's card was placed there only because he had requested to see some written expression of Post Office policy. Ms. Albert never made any such request. As to the 14-day suspension that plaintiff ultimately received, this was premised not only on his exceeding the 12-hour limit but also on two subsequent incidents. No evidence was presented to suggest that Ms. Albert or any other black or female employee was involved in comparable conduct.

With respect to plaintiff's failure to follow official instructions in April, 1979, plaintiff alleges that several of his co-workers were involved in conduct that was comparable to, if not worse, than his conduct and that they were not disciplined as severely as he was. Specifically, plaintiff cites the cases of four individuals who ran a gambling operation and another, Debra Fantroy, who had a long record of attendance violations.[3] In response, defendant

notes first that the punishment that plaintiff received in 1979, namely discharge, was the proper next step in the system of "progressive discipline" used consistently by the Postal Service and incorporated into the collective bargaining agreement applicable to the plaintiff. Plaintiff had previously received several disciplinary counselings and a suspension of under 30 days before the sanction of discharge was used. Second, defendant notes that, under Postal Service regulations, ethical violations, such as gambling, and attendance rule infractions are treated separately from work performance rule violations, *see* Defendant's Exhibit 22, at Parts 666.51, 666.8, and accordingly, the records of the other individuals cited by plaintiff are not comparable to plaintiff's. While this Court may question the sagacity of such distinctions, the question before it is not whether the distinctions are desirable but rather whether they were actually and equally applied or are instead pretextual. Plaintiff produced no evidence that these facially non-discriminatory distinctions between work performance rule violations and ethical violations and between work performance rule violations and attendance rule violations have not been actually applied. This would have gone a long way toward a showing of pretext. Instead, plaintiff suggested that perhaps his best evidence of pretext was the disciplinary record of Debra Fantroy. Plaintiff's Exhibit 17. However, the Court is not even persuaded by that evidence. Moreover, defendant produced evidence that from April 8, 1977 to May 23, 1979, 19 employees were, like plaintiff, removed from the Postal Service for failure to follow official instructions, and of these 19, only one or two were white males, while 8 were black males, 7 were black females, one was a white female, and one was a male of hispanic origin. Defendant's Exhibit 29.

---

3. Plaintiff also cited the case of Supervisor Ludie Johnson who spoke to plaintiff in an abusive manner and received only a "hand slap" from Superintendent Campbell. However, plaintiff introduced no evidence of Johnson's other disciplinary violations, nor was it shown that actions by a Supervisor can be considered "comparable" to similar acts by a clerk such as Mr. Plummer.

Thus, looking claim by claim, the Court concludes that plaintiff either has not shown evidence of unequal discipline for comparable conduct or has not persuasively rebutted defendant's legitimate, non-discriminatory justifications for the sanctions which plaintiff has challenged. This leaves plaintiff's charges of race and sex discrimination with respect to acts by defendant that are not formally "disciplinary," such as the denials of a change of radio station or failure to commend for finding a piece of mail. It appears to the Court that these charges were included here by plaintiff in an effort to demonstrate a "pattern" of actions by defendant unexplainable on non-discriminatory grounds and sufficient to raise an inference of discrimination. Defendant has, however, rebutted these charges by providing legitimate, non-discriminatory explanations for the actions it took.

The specific charges are perhaps best itemized one by one:

1. Plaintiff claims first that he was assigned a disproportionately small amount of armed convoy duty in 1978. As defendant correctly notes, however, when viewed *in toto,* the statistics on the assignment of convoy duty do not demonstrate any discrimination against the plaintiff.

2. Plaintiff claims that he was forced to listen to black-oriented music played on a private radio in his work area. In response, defendant correctly explains that special permission was obtained for the use of the private radio in Registry, and that a majority of Registry employees favored the playing of the radio and the stations played on it.

3. Plaintiff claims that, in two instances, he was not commended by his supervisors for finding lost or mislaid pieces of mail. Supervisor Dailey, however, explained that he did not commend plaintiff for discovering mail because, in his work

area, clerks commonly discovered mail as plaintiff did. Supervisor Warren, while he did not commend plaintiff for finding excess mail, later *did* commend plaintiff for ·coming to work during a blizzard, which was the type of conduct that he considered to be worthy of commendation.

4. Plaintiff claims that he was not allowed to exceed the 12-hour limit on hours when he appeared for work during a blizzard, whereas other Postal Service employees were allowed to do so. In response, defendant explains that the other employees who were allowed to exceed the 12-hour limit on that day worked in a different area of the Post Office which had to get the mail out, whereas plaintiff's work area did not. Moreover, Superintendent Campbell testified that plaintiff did not even request to exceed the 12-hour limit that day.

5. Plaintiff claims that he was denied a change of radio station at the same time as the request of a black co-worker was honored. Defendant counters that plaintiff's denied request was not in fact made at the same time as the request he alleges was honored. More importantly, defendant persuasively established that the radio stations that were played in the Registry area, that were not plaintiff's choice, were the choice of a majority of Registry employees.[4]

6. Plaintiff claims that his firearms permit was not renewed in the fall of 1978 while several other employees had their permits renewed. Defendant countered that there was no need to renew any but a few firearm permits because the Postal Service had decided to transfer the job of armed convoy duty, for which the permits were needed, to a special security force.

7. Plaintiff complains that Supervisor Ludie Johnson discriminated against him when he addressed plaintiff in a rude and insulting manner. In response, Superintendent Campbell testified that Johnson

---

**4.** Defendant correctly points out that this claim and plaintiff's claim with respect to work hours on the day of the blizzard were not included in plaintiff's complaint and that leave to include them has never been granted. While the Court agrees with defendant that "notice pleading" should not be encouraged, the Court considers these incidents to be non-dispositive of plaintiff's case, and thus sees little harm in considering the evidence on them that is already before it.

had used similar language in addressing black employees and that he had advised Johnson not to use such profanity with any of the workers under his supervision.

8. Plaintiff complains that he was not given any of the safety talks that were held in Registry over a four-month period in 1979. Defendant explains, and plaintiff has stipulated, that half of the talks were given on days when plaintiff did not normally work or was absent from work. To the Court, this is an ample explanation for why plaintiff may have missed the talks.

9. Lastly, plaintiff claims that he was not allowed to work on July 4, 1981 even though he was on the "overtime desired" list. Defendant legitimately explains that the "overtime desired" list is not used in selecting employees to work on holidays like July 4, but rather full-time, regular employees who volunteer to work on such days are allowed to work in the order of seniority. In sum, each of the incidents about which plaintiff has complained *is* explainable on non-discriminatory grounds and defendant has in fact so explained them. Thus, the Court cannot and will not infer to defendant a discriminatory intent with respect to these incidents.

Plaintiff's final claim is that he was discriminated against by defendant in reprisal for prior EEO activities. In order to establish a *prima facie* case of reprisal, plaintiff must show: 1) that he engaged in protected activities, 2) that his employer was aware of the protected activities, and 3) that within a relatively short time interval after his performance of these activities, his employer disciplined him in a manner permitting the Court to infer retaliatory motivation. *Gonzalez v. Bolger,* 486 F.Supp. 595, 601 (D.D.C.1980); *Brown v. Biglin,* 454 F.Supp. 394, 399 (E.D.Pa.1978). In the instant case, there can be little doubt that plaintiff has in fact satisfied all three of these requirements. Plaintiff brought almost innumerable EEO complaints that his supervisors could hardly help knowing about and that were inevitably close in time to other incidents that plaintiff alleged showed discrimination. Defendant has,

however, rebutted the inference of discrimination created by plaintiff's showing of a *prima facie* case by presenting substantial proof that plaintiff's misconduct and disruptive behavior were in fact the cause of his discipline. *Gonzalez v. Bolger,* 486 F.Supp. at 601–02. Plaintiff has certainly not demonstrated that this non-discriminatory justification for discipline was pretextual. Indeed, the Court has found that plaintiff did in fact engage in the conduct for which he was disciplined and the discipline applied was proper under defendant's established system of progressive discipline.

## CONCLUSION

In sum, the Court holds that 1) with respect to plaintiff's claims of discrimination on the basis of color and national origin, plaintiff has not established a *prima facie* case, 2) with respect to plaintiff's claims of discrimination on the basis of race and sex, plaintiff has either not established a *prima facie* case or has failed to persuasively rebut defendant's legitimate, non-discriminatory explanation for its actions, and 3) with respect to plaintiff's claims of discrimination on the grounds of reprisal, plaintiff has established a *prima facie* case, but has failed to persuasively rebut defendant's legitimate, non-discriminatory explanation for its actions. As already noted, the Court also wishes to commend counsel for their exceptional work in this case. Finally, in light of the Court's finding that there has been no discrimination, the Court wishes to suggest to plaintiff personally that he consider a somewhat less adversarial approach to the problems he has encountered in the Post Office. It appears to the Court, and indeed one of plaintiff's white co-workers testified, that plaintiff can be vituperative, vindictive, and disruptive. With that sort of demeanor, it is not hard to understand why plaintiff sees discrimination all around him. Perhaps with a different attitude, plaintiff may again be able to find satisfaction with his work and with his co-workers, and may indeed be able to rise as a worker to the full potential that he appears to this Court to have.

An order in accordance with the foregoing shall issue of even date herewith.