TOMLIN and REID, Special Justices, not participating.

Richard D. PHILLIPS, Appellant,

v.

**INTERSTATE HOTELS CORPORATION # L07 and Interstate Hotels Corporation # L07 d/b/a Chattanooga Marriott and Kicks Lounge, Appellee.**

Supreme Court of Tennessee, at Knoxville.

June 15, 1998.

Anita B. Hardeman, Brown, Dobson, Burnette & Kesler, Chattanooga, for Appellant.

Karl M. Terrell, Stokes & Murphy, Atlanta, GA, K. Stephen Powers, Witt Gaither & Whitaker, P.C., Chattanooga, for Appellee.

## OPINION

HOLDER, Justice.

We granted this appeal to determine whether a music selection policy can serve: (1) as the basis for discrimination; and (2) as an underlying cause of action to support a claim of constructive discharge.[1] The trial court granted summary judgment in favor of the defendant. The Court of Appeals af-

---

1. Oral argument was heard in this case in Morristown, Hamblen County, Tennessee, as part of this Court's S.C.A.L.E.S. (Supreme Court Advancing Legal Education for Students) project.

firmed the trial court's dismissal. Upon review, we affirm the appellate court's dismissal and hold that an establishment's music selection cannot serve as grounds for discrimination under the Tennessee Human Rights Act.

## BACKGROUND

The issue with which we are confronted in the appeal is fairly narrow and best stated as:

whether a member of a non-protected class who was not subjected to discrimination can maintain a discrimination suit under the Tennessee Human Rights Act based on the allegation that he was forced to play music which he subjectively believed discriminated against a protected class by denying the members of a protected class access to a place of public accommodation.

The plaintiff, Richard D. Phillips, worked as a disc jockey at the Kicks Lounge located in the Chattanooga Marriott; he was employed by World Wide Entertainment ("WWE"). WWE contracted out the plaintiff's services to Kicks. Interstate Hotels Corporation # LO7 owns and operates both Kicks and the Marriott.

The plaintiff began working at Kicks in May of 1991. He alleges that his manager, Bobby Johnson, instructed him to play either country or fifties music whenever a large number of black couples were dancing. Johnson's alleged stated purpose was to discourage black patronage. The plaintiff further alleges that he was instructed to avoid playing dance music altogether when there were "too many" black patrons in Kicks.

The plaintiff voiced disagreement with Johnson's policies and chose to ignore Johnson's instructions on several occasions. The plaintiff, however, maintains Johnson either threw napkins at the plaintiff with "TOO BLACK" written on them or shined a flashlight in his eyes when he ignored Johnson's instructions.

The plaintiff cites additional incidents of discriminatory conduct that he allegedly witnessed while working at Kicks. These activities neither involved his role in music selection nor required his efforts to effect compliance. He claims that Kicks refused seating to black patrons, required identification from black patrons but not white patrons, enforced an ad hoc dress code only against black patrons, refused to run tabs for black patrons, imposed drink minimums on black patrons, and charged only black patrons a cover charge. The plaintiff asserts that Johnson refused to allow a lip sync contest on the basis that it would encourage additional black patronage. The plaintiff further maintains that Johnson would close Kicks early if too many black patrons were present. Lastly, the plaintiff alleges that Kicks quit serving Budweiser on draft and began serving Killian's on draft because Budweiser was popular among black patrons. The plaintiff, however, does not contend that he was commanded or compelled to participate in or to enforce these policies.

In September and October of 1991, the plaintiff requested that WWE "move [him] up in the company." He conveyed that he was willing to relocate and "accept the challenge." WWE did not offer the plaintiff another position. In January of 1992, the plaintiff tendered his notice of resignation. He, however, agreed to remain for one month following his notice of resignation. After the expiration of the one-month period, the plaintiff worked an additional seven to ten days. The plaintiff also returned to Kicks to work as a disc jockey on two occasions in May and in April of 1992.

The plaintiff filed suit against the defendants in February of 1993 alleging that the defendants constructively discharged him by "commanding him to perform illegal acts." Specifically, the plaintiff asserts that the defendants violated Tenn.Code Ann. § 4–21–501 of the Tennessee Human Rights Act ("THRA") by denying black patrons the full and equal enjoyment of Kicks' goods, services, facilities and accommodations. The plaintiff's cause of action is premised on allegations that the defendants forced him to participate in this illegal and discriminatory activity in violation of Tenn.Code Ann. § 4–21–301.

The trial court granted the defendants' motion for summary judgment. The Tennes-

see Court of Appeals affirmed the trial court's dismissal. The appellate court found that a change in music selection did not constitute a denial of the full and equal enjoyment of the lounge under the meaning of Tenn.Code Ann. § 4–21–501. The court reasoned that the change affected all patrons equally. The appellate court further found that the plaintiff failed to show the requisite elements of a claim for constructive discharge. We granted review to resolve these important issues of public policy. Upon review, we affirm the appellate court's decision as modified.

## PUBLIC ACCOMMODATION

The THRA is a comprehensive anti-discrimination statute that is codified at Tenn. Code Ann. §§ 4–21–101–905 (1991 & Supp. 1996). Tennessee Code Annotated § 4–21–501 prohibits discrimination in places of public accommodation and provides in pertinent part:

Except as otherwise provided in this chapter, it is a discriminatory practice for a person to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of a place of public accommodation, resort or amusement, as defined in this chapter, on the grounds of race, creed, color, religion, sex, age or national origin.

The THRA defines "public accommodation" as:

... any place, store or other establishment, either licensed or unlicensed, which supplies goods or services to the general public or which solicits or accepts the patronage or trade of the general public, or which is supported directly or indirectly by government funds, ....

Tenn.Code Ann. § 4–21–102(15) (Supp.1996).

■ Our initial inquiry is whether Kicks is a place of public accommodation. Kicks is a place of entertainment which serves alcohol and provides a meeting place for individuals to socialize and dance. The establishment is in a Marriott hotel located in Chattanooga, Tennessee. Accordingly, we find that Kicks satisfies the THRA's definition of a place of public accommodation.

■ The plaintiff's claims are predicated upon Kicks' compelling him to participate in a violation of the THRA's public accommodations section. Pursuant to Tenn.Code Ann. § 4–21–301:

It is a discriminatory practice for a person or for two (2) or more persons to:

(2) Aid, abet, incite, compel or command a person to engage in any of the acts or practices declared discriminatory by this chapter;

... [or]

(4) Willfully obstruct or prevent a person from complying with the provisions of this chapter or an order issued thereunder[.]

Tenn.Code Ann. § 4–21–301(2) & (4) (1991). The plaintiff alleges that he was commanded or compelled to participate in an elaborate scheme of discrimination.

Subsection (4) requires a showing that one was prevented or obstructed from complying with a provision of the THRA. We believe that subsection (4) addresses the situation in which a "person's" conduct renders another's ability to comply with the THRA an impossibility. The plaintiff could have refused to comply with Johnson's commands. Accordingly, we find that the plaintiff was neither obstructed nor prevented from complying with the THRA as contemplated under Tenn. Code Ann. § 4–21–301. Our analysis, therefore, will focus on § 4–21–301(2) under which we must find: (1) that Kicks compelled or commanded the plaintiff to violate or participate in a violation of the THRA; (2) that the plaintiff acted in a manner consistent with Kicks' commands; and (3) that the plaintiff's conduct constituted a violation of the THRA. For the reasons cited in this opinion, the plaintiff's cause of action fails under the first requirement.

■ The relevant portions of our public accommodation statute are virtually identical to the federal version codified at 42 U.S.C. § 2000a (1988). Although the language differs slightly, it is clear that the legislature intended the THRA to be coextensive with federal law. *Bennett v. Steiner–Liff Iron and Metal Co.*, 826 S.W.2d 119, 121 (Tenn.

1992) (citing Tenn.Code Ann. § 4–21–101(a)(1) (1991) (stating purpose and intent of general assembly was to "provide for execution of the policies embodied in the Federal Civil Rights Acts.")). We, therefore, may look to federal interpretation of Title VII for guidance in enforcing our own anti-discrimination statute. We, however, are neither bound by nor limited by federal law when interpreting the THRA.

■ This Court has not previously set forth the burden of proof in a public accommodations case under the THRA. Upon review of federal case law, we adopt the burden of proof analysis employed in *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under *Burdine*, the plaintiff bears the initial burden of establishing a prima facie case. A presumption of discrimination arises if the plaintiff establishes a prima facie case. If the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant to proffer a legitimate non-discriminatory reason for the challenged actions. The presumption created by the showing of a prima facie case is negated if the defendant successfully proffers a legitimate reason for the challenged action. The burden then shifts back to the plaintiff to show that the defendant's proffered explanation was a pretext for discrimination. *Id.* at 1094–96. While the burden of production alternates between the parties, the plaintiff at all times retains the ultimate burden of persuasion. *Id.* at 1096; *Soreo–Yasher v. First Office Management*, 129 F.3d 1265 (6th Cir.1997).

The dissent assumes that intent or motivation is relevant absent a showing of a prima facie case. We disagree. The requirement that the defendant proffer a non-discriminatory explanation is not triggered absent a plaintiff's showing of a prima facie case.

■ To establish a prima facie case for a violation of the THRA's public accommodation provision, a plaintiff must show: (1) that the plaintiff is a member of a protected class; (2) that the defendant operated a place of public accommodation; and (3) that the plaintiff has been denied access to the defendant's place of public accommodation. In establishing the denial-of-access requirement, the plaintiff may also show that he was subjected to disparate treatment and that the disparate treatment had the effect of deterring access. *See .United States v. Glass Menagerie, Inc.*, 702 F.Supp. 139, 143 (E.D.Ky. 1988) (providing VIP cards to white patrons and not black patrons and allowing only white patrons to use VIP entrance subjected black patrons to. disparate treatment which had effect of denying access to club). For example, requiring identification from all patrons affects every patron equally. On the other hand, requiring multiple forms of identification only from members of a protected class is a form of disparate treatment designed to deter access.

This Court has not addressed whether a place of public accommodation's music selection can serve as a basis for discrimination. In a case with facts strikingly similar to those in the case now before us, a federal district court held that a bar's music selection cannot be grounds for finding that the bar engaged in discriminatory conduct. In *Stearnes v. Baur's Opera House, Inc.*, 788 F.Supp. 375 (C.D.Ill.1992), *rev'd on other grounds*, 3 F.3d 1142 (7th Cir.1993),[2] the manager allegedly told disc jockeys that it was "too dark in here" when numerous black patrons were inside the bar. This statement was a signal to the disc jockeys to play "hard rock and roll" to induce black patrons to leave. On one occasion, the manager "pull[ed] a record to which several blacks were dancing and replace[d] it with a 'hard rock' song." *Id.* at 377. One of the disc jockeys resigned as a result of the music selection policies.

The court in *Stearnes* held that, while the defendant's conduct demonstrated a "gross insensitivity," a "bar's music selection cannot be grounds to find discriminatory conduct." *Id.* (citing *Contemporary Music Group, Inc. v. Chicago Park Distr.*, 343 F.Supp. 505

---

2. The Seventh Circuit Court of Appeals remanded *Stearnes* for dismissal on jurisdictional grounds. Other federal courts, *infra*, have cited *Stearnes* with approval without noting its subsequent procedural history. We recognize that *Stearnes* is not binding precedent on either federal courts or this Court but find its reasoning persuasive.

(N.D.Ill.1972)) (holding park district's refusal to allow rock concerts in park does not in itself show invidious discrimination); *Plummer v. Bolger*, 559 F.Supp. 324 332 (D.D.C. 1983) (finding defendant did not engage in discriminatory conduct by refusing to allow white plaintiff to change radio station from channel that played black oriented music). The court elaborated that:

> [i]f music selection was a basis for ... discrimination suits, a fundamentalist christian could sue a club which played music containing offensive lyrics for religious discrimination; or women could sue employers whose musical selections contained perceived sexist lyrics for sex discrimination. [The] Court does not believe that Congress intended such a result ... all that the Act requires is that all patrons be admitted and served without discrimination.

*Stearnes*, 788 F.Supp. at 378. In *Stearnes*, the court found no evidence that the defendants engaged in the practice of barring certain patrons from the dance floor. "Instead, the bar's patrons chose not to dance when specific types of music were played." *Id.* When the music was changed, "that change affected all patrons' decisions concerning whether to remain on the dance floor, not just black customers." *Id.*

The federal analysis in public accommodation law focuses on access to a business and its product. *See Robertson v. Burger King, Inc.*, 848 F.Supp. 78, 81 (E.D.La.1994) (citing *Stearnes* and holding no civil rights violation for slow service as "plaintiff was not denied admittance or service"); *White v. Denny's Inc.*, 918 F.Supp. 1418, 1429 (D.Col.1996) (citing *Stearnes* and finding no civil rights violation based on preferential seating as plaintiff was not denied access). One has been denied the enjoyment of a public accommodation if access to that place of public accommodation has been denied based solely on racial animus. *See Bermudez Zenon v. Restaurant Compostela, Inc.*, 790 F.Supp. 41, 44 (D.P.R.1992) (holding denial of access to res-

taurant on basis of race actionable); *Franceschi v. Hyatt Corp.*, 782 F.Supp. 712, 718 (D.P.R.1992) (holding denial of access on basis of race actionable). Federal courts also have recognized that conduct that deters or impedes access to a place of public accommodation may be actionable. *See United States v. Glass Menagerie, Inc.*, 702 F.Supp. 139, 143 (E.D.Ky.1988) (granting injunctive relief where blacks held outside in lines while whites were admitted ahead of them and where club used VIP entrance to allow whites entrance while keeping blacks out of club).

▪▪▪ The plaintiff alleges that he was forced to play music that Johnson believed would induce black patrons to leave the establishment. The plaintiff further asserts extremely disconcerting allegations concerning policies employed by Kicks' management designed to create impediments to minority patrons attempting to enter Kicks. The record, however, does not indicate that the plaintiff was forced to participate in the activities designed to deny minorities access. His responsibilities were limited solely to those involving the selection and playing of music. Accordingly, the plaintiff only has standing to challenge the club's music selection policies.

The dissent's reasoning is flawed in that the dissent would find actionable a racist attitude or an intent to discriminate without any accompanying differential treatment or unlawful discrimination.[3] An act, however, is not unlawful merely because the actor is appalling, ignorant, or grossly insensitive. While we neither agree with nor condone Johnson's alleged behavior and the alleged policies employed by Kicks, we cannot bend the law until it breaks simply to afford relief in one cause of action when the potential repercussions of such a holding could impact society's freedom of choice and expression. Moreover, we are hesitant to fashion a rule meant only to address false stereotypes that all individuals' taste in music fall neatly within specified cultural or racial boundaries.[4]

---

3. Although the dissent's reasoning is unclear and does not cite any case law in support of its analysis of a prima facie, it appears that the dissent would substitute the intent to discrimi-

nate for disparate treatment or actual discrimination in a prima facie case.

4. The record before us indicates that black patrons continued to dance even when the music

Businesses have the right to target strategic markets comprised of specified classes or groups of individuals. For example, a club may choose to target black patronage by playing a certain style of music which, in management's opinion, will attract its target market. A non-black individual, however, should not have a cause of action for discrimination merely because that club's musical format is not preferred by the non-black patron. If this Court were to adopt such a rule, all public facilities potentially would be forced to play diversified music that would cater to every racial and ethnic group to avoid possible discrimination suits.

■ We believe that the issue is one of choice—that of the business owner and that of the individual patrons. If an individual chooses to listen to certain styles of music or eat certain types of food, that individual should have access to places of public accommodation providing those preferences. The focus is on access to the business and its products and not on the type of products provided by the business.[5] Accordingly, denial of or impediments to entrance into a place of public accommodation based solely on racial animus violates Tenn.Code Ann. § 4–21–501. A patron's mere dislike of an establishment's product, however, is not actionable under § 4–21–501.

■ A prima facie case of discrimination under the THRA's public accommodations provision cannot be established absent a showing of either a denial of access or disparate treatment designed to deny or deter access. In the case now before us, the music selection policy did not preclude or deter

minorities from entering Kicks. To be able to draw conclusions concerning the music, a patron would necessarily have gained access to the facility. Once inside Kicks, all patrons were affected equally by the music selection policy, as every patron, regardless of race, was subjected to the same music selections. Accordingly, the music selection policy did not subject different classes to disparate treatment. The plaintiff has failed to establish a prima facie case. The defendant's burden to proffer a legitimate reason, therefore, is not triggered, and the defendant's intent or motivation does not become an issue.

The dissent relies heavily on *United States v. Glass Menagerie, Inc.*, 702 F.Supp. 139 (E.D.Ky.1988). The facts in *Glass Menagerie*, unlike the facts in the present case, support a finding of a prima facie case. The plaintiffs were members of a protected class, and Glass Menagerie was a place of public accommodation. Disparate treatment occurred by the dispensing of VIP cards almost exclusively to white patrons and by permitting white patrons to use a VIP entrance.[6] The effect of the VIP entrance and the VIP cards was to "delay or prevent admission of black persons." Accordingly, the court enjoined the defendants from engaging in conduct which subjected black patrons to disparate treatment and delayed or prevented their admission to the club. Similar disparate treatment did not occur by the changing of music selections in the case now before us as one would have to gain access to the club to determine whether one liked the music selections.[7]

---

selection was changed.

5. In a recent opinion by the Sixth Circuit, the court held that the public accommodation requirements under the ADA were:

> to ensure accessibility to the goods offered by a public accommodation, not to alter the nature or mix of goods that the public accommodation has typically provided. In other words, a bookstore, for example, must make its facilities and sales operations accessible to individuals with disabilities, but is not required to stock Braille or large print books. Similarly, a video store must make its facilities and rental operations accessible, but is not required to stock closed-captioned video tapes.

*Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006, 1012 (6th Cir.1997).

6. One black patron was apparently provided a VIP card. The black patron, however, was charged for the VIP card whereas the testimony indicates that whites were not charged for VIP cards.

7. We would also point out that *Glass Menagerie* addressed only whether the defendants should be temporarily enjoined from using VIP cards and a VIP entrance which had the effect of deterring access to minority patrons.

The dissent's analysis focuses on intent or motivation absent a finding of a prima facie case which requires either disparate or differential treatment. This is precisely the approach that creates a slippery slope by requiring courts to inquire into subjective motivation behind policies that appear facially neutral or that affect all patrons equally. While some may find distasteful certain music selections, foods, clothes, or any tangible good or intangible service, taste or preference should not form the basis for a claim of discrimination in a public accommodation case under the THRA. There must be either a denial of access or some form of disparate treatment. Because the plaintiff has not been compelled or commanded to engage in conduct which violated the THRA, his claim under Tenn.Code Ann. § 402–10–301 is devoid of merit.

## CONSTRUCTIVE DISCHARGE

 A constructive discharge claim requires a viable underlying cause of action. *See Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 33 (Tenn.1996) (finding constructive discharge requires subjection to intolerable and illegal working conditions); *see also Turner v. Anheuser–Busch, Inc.*, 7 Cal.4th 1238, 32 Cal.Rptr.2d 223, 876 P.2d 1022, 1030 (1994) (noting plaintiff must show underlying cause of action to obtain damages for constructive discharge that is neither tort nor breach of contract); *Vagts v. Perry Drug Stores, Inc.*, 204 Mich.App. 481, 516 N.W.2d 102, 104 (1994) (stating "constructive discharge is not in itself a cause of action" but merely a defense to an allegation that employee voluntarily resigned). The plaintiff's failure to state a cause of action under the THRA is fatal to his constructive discharge claim. Accordingly, the plaintiff's claim for constructive discharge is without merit.

The judgment of the Court of Appeals affirming the trial court's dismissal is affirmed as modified. Cost of this appeal shall be taxed to the plaintiff, Richard D. Phillips, for which execution may issue if necessary.

DROWOTA, J., concurs.

LYLE REID, Special Justice, concurs with separate opinion.

BIRCH, J., dissents

ANDERSON, C.J., concurs in dissent.

LYLE REID, Special Justice, concurring.

I concur in the results reached in the lead opinion, however, I write separately because, in my view, neither the lead opinion nor the dissent articulates precisely the determinative issue in this case.

I agree with the position of the lead opinion that the pre-requisite for a *prima facie* case is evidence that access to a public accommodation was denied, and denial can be shown by evidence of disparate treatment that deterred access. Under this rule, there must be actual denial of access or disparate treatment that deterred access. "Deter" is defined as "to discourage or stop by fear." *Black's Law Dictionary* 450 (6th ed. 1990). Consequently, even where there has not been actual denial of access, evidence of disparate action that discourages, as distinguished from denies, the use of a public accommodation establishes a *prima facie* case.

I also agree with the lead opinion that targeting specific classes or groups of persons as customers is permitted. That targeting may lawfully be accomplished by the selection of music. The selection of music played in a public place obviously does not deny access. Nor is it disparate action, even if it is intended to encourage or discourage utilization by particular persons or groups, because all patrons are treated the same even though the effect on all persons will not be the same. The language in the lead opinion that "patrons were affected equally by the music selection policy" is misleading. It did not affect all persons equally, nor was it intended to affect all persons equally. There is evidence that the music played was intended to discourage black persons from patronizing the club. This intent implemented was a permissible "business-based attempt to appeal to a selected segment of the general market" as stated in the dissent.

Consequently, intent to discriminate cannot be determinative, as suggested by the dissent. I agree with the dissent that evidence of intentional, unlawful conduct estab-

lishes a *prima facie* case. I also agree with the dissent that the intentional effort to deny full and equal enjoyment because of race is a violation of the statute even though the effort may be subtle or insidious. However, conduct which merely discourages access is not unlawful unless it is different in kind based on the race of the persons to whom it is directed. While all agree with the dissent's position that proof that a practice was designed to deny access establishes a *prima facie* case, I cannot agree with the dissent's position that a *prima facie* case is established by proof that a practice was designed to dissuade or discourage the exercise of the right of access. Conduct designed to *deny* access based on race is prohibited, and disparate conduct based on race designed to *dissuade* or *discourage* utilization is prohibited. But conduct based on race designed to dissuade or discourage utilization is not prohibited.

In this case there is no evidence of conduct designed or intended to *deny* access, nor is there evidence that there was *disparate* conduct directed toward black patrons. Consequently, summary judgment for the defendant was appropriate.

BIRCH, Justice, dissenting.

Reasoning that an establishment's music selection policy cannot serve as grounds for a discrimination claim, the majority concludes that the plaintiff cannot state a *prima facie* case of discrimination under the public accommodations provision of the Tennessee Human Rights Act (THRA). Because I do not agree with the proposition that a discrimination claim can never arise from these circumstances, I respectfully dissent.

Certainly, I agree with the principle that businesses have the right to target strategic markets by playing certain music, choosing particular decor, etc. Thus, the right to *lawfully* discriminate is both fundamental and unquestioned. In my opinion, however, there is a chasm of difference between invidi-

ous race-based discrimination and the innocent business-based attempt to appeal to a selected segment of the general market. Moreover, providing a cause of action for the former will not necessarily create a cause of action for the latter. The key distinction is intent, for only if a defendant is motivated by a racial animus may his or her acts be unlawful.

A violation of the public accommodations provision of the THRA occurs when a defendant denies or deters access to a place of public accommodation on the basis of race. Unlike the majority, I find it possible for the plaintiff to show that a discriminatory music selection policy actually had the effect of deterring access to Kicks Lounge by black patrons. It is conceivable to me that a defendant may succeed in the furtive goal of deterring access by black patrons through changes in the music selection.[1] After all, if the change in music occurred only when black patrons were present, then it cannot possibly be said to affect all patrons equally. The fact that the changes may not affect other black patrons or may incidentally deter some non-black patrons, in my view, does not make the cause of action untenable. In sum, I am simply unwilling to foreclose this plaintiff, and all future plaintiffs, from obtaining relief from purposeful, invidious discrimination merely because the conduct in dispute *appears* facially neutral.

The intentional effort to deny full and equal enjoyment of a place of public accommodation because of race is a violation of the THRA, whether accomplished through the outright denial of access or through a more subtle and insidious method. To permit discrimination in public accommodations "in any form or to any degree would be a regression in the evolution of our society." *United States v. Glass Menagerie Inc.*, 702 F.Supp. 139, 142 (E.D.Ky.1988). Because this case is before the Court in the context of summary judgment, I do not address the ultimate question whether the plaintiff has satisfied his burden of persuasion. However, with

---

**1.** This is true even if the music selection policy is based on false assumptions and erroneous stereotypes, such as the assumption that all individuals' tastes in music fall within racial boundaries. The question is whether the practice had a dis-

criminatory purpose and effect, not whether the assumptions behind the practice are rational. Indeed, discriminatory practices generally are based on false assumptions and erroneous stereotypes.

respect to the issue whether the defendant commanded the plaintiff to participate in a discriminatory practice, i.e., the music selection policy, I would hold that the defendants are not entitled to summary judgment under Tenn.R.Civ.P. 56, and I would remand for a determination whether the plaintiff can establish a *prima facie* case.

Chief Justice ANDERSON joins in this dissent, and I am authorized to so state.