Charles Douglas SLADE, Plaintiff,

v.

James H. BILLINGTON, Defendant.

Civ. A. No. 86–1723.

United States District Court,
District of Columbia.

March 18, 1988.

Courts Oulahan, Washington, D.C., for plaintiff.

Mark E. Nagle, Asst. U.S. Atty., Washington, D.C., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

REVERCOMB, District Judge.

## I. INTRODUCTION

This case was tried before the Court on September 14–18 and 21–22, 1987. The Court now adopts as its own, with modifications, defendant's proposed findings of fact and conclusions of law. It is clear that the plaintiff has good professional qualifications and experience. However, the Court must conclude on this record that plaintiff has not met his burden of showing a discriminatory motive on the part of his supervisor, who favored two other persons for promotion to GS–13 positions. There is some evidence that suggests only that plaintiff's supervisor was motivated by a desire to hire friends and former colleagues from the District of Columbia Government.

The Court also concludes that plaintiff has not sustained his burden of proof to show that a proposed adverse action, the delay in processing his EEO complaint, the admonishments to Gartmon and Johnson, and the denial of court leave were retaliatory in nature.

## II. FINDINGS OF FACT

1. Plaintiff C. Douglas Slade, a white male, is employed by defendant, Library of Congress, as a GS–12 Position Classification Specialist in the Position Classification and Organization Office ("PC & OO"), and has been so employed since October 1979 (Admissions 2.1 and 2.2, Plaintiff's Ex. 21).

2. Plaintiff alleges discrimination against him because of his race, color and sex in connection with his non-selection for a position as a GS–13 Expert Position Classification Specialist in the Position Classification and Organization Office of the Library of Congress in March, 1984 (AMENDED COMPLAINT, Exhibit 1) and reprisal because of his filing an informal (and later formal) complaint of discrimination with the Equal Employment Opportunity Complaints Office ("EEOCO") of the Library in the form of a notice of proposed adverse action for a five (5) work days suspension on May 30, 1984, (AMENDED COMPLAINT, Second Cause of Action), reprisal in the form of charging annual leave for a portion of time spent conferring with his attorney and reprisal in the form of mishandling of his EEO complaint by the Library's EEOCO (AMENDED COMPLAINT, para. 4.16 and 4.17). In addition, plaintiff has alleged retaliation against witnesses favorable to him in this case (AMENDED COMPLAINT, para. 4.19–4.-29), although no separate cause of action is alleged with respect thereto.

3. In 1980, before the events giving rise to the present cause of action, PC & OO was manned by 13–16 specialists and clerks (Plaintiff's Ex. 70 C). The chief of the office was Alice E. Riley, a white female (Plaintiff's Ex. 145), who had the title of Position Classification & Organization Officer and was a GS–14 Supervisory Position Classification Specialist (Plaintiff's Ex. 70 C). The assistant chief of the office was Gladys D. Kimbrough, a black female (Plaintiff's Ex. 20), who as a GS–13 Supervisory Position Classification Specialist (Plaintiff's Ex. 70 C). Also at that time, there were spots for four (4) GS–12 Position Classification Specialists (Plaintiff's Ex. 70 C). The plaintiff was hired into the office in October, 1979, by Alice Riley (Plaintiff's Ex. 70 C) as a GS–12, Position Classification Specialist. In addition to the plaintiff, there was one vacant position and two other GS–12s: Ray E. Parker, a white male (Plaintiff's Ex. 20), and Ira Johnson, Jr., a black male (Plaintiff's Ex. 141). Mr. Johnson was hired into PC & OO from the District of Columbia government in June, 1980 (Plaintiff's Ex. 70 C) as a GS–12 (Tr. 233). (References to the transcript are des-

ignated "Tr." followed by page number.) While at the District of Columbia government, Mr. Johnson worked in the Classification Office of the D.C. Public Schools Personnel Department (Tr. 233). His supervisor at the Library of Congress in 1970 at the time of his hire into the Library was Alice Riley (Plaintiff's Ex. 70 C). Also in the office at that time were three (3) GS–11 Position Classification Specialists: Durward A. Mannering, who left in mid–1982 (Tr. 236–7), LaVerne Cox, a black female, and Laura A. Christian, a black female (Plaintiff's Ex. 20). Ms. Cox, had been hired in the spring of 1980 by Ms. Riley (Plaintiff's Ex. 20). Prior to coming to the Library of Congress, Ms. Cox had worked in personnel for the District of Columbia Government (Plaintiff's Ex. 20). Also in the office at this time were one GS–9 Position Classification Specialist, Debra Ann Smith, (Plaintiff's Ex. 70C), a black female, and one GS–7 Position Classification Specialist, Elizabeth D. Maloney (Plaintiff's Ex. 70 C), a white female (Plaintiff's Ex. 1421). Finally, as a Classification Assistant was Annie L. Gartmon, (Plaintiff's Ex. 70 C), a black female, and Iris Herndon Toyer, Classification Clerk (Plaintiff's Ex. 70 C), a black female (Tr. 167). Thus, prior to the events giving rise to this cause of action, the top two positions in the office were held by females (the Position Classification Officer and the Assistant Position Classification Officer), and blacks held a majority of the position classification positions (7 out of 11) [1]

4. In March 1981, LaVerne Cox was promoted to a GS–12 Position Classification Specialist in PC & OO (Plaintiff's Ex 126), by Alice E. Riley (Tr. 389).

5. During the time when Alice Riley was still Chief, PC & OO, the idea of the creation of GS–13s in PC & OO was discussed in the office (Tr. 238).

6. When Alice Riley resigned as Chief, PC & OO in March, 1981, Gladys D. (Kimbrough) Carpenti (black, female) served as Acting Chief (Plaintiff's Ex. 136).

*Selection of Donald Ware as Chief, PC & OO*

7. The initial vacancy announcement (No. 10094) for the replacement for the Chief's job had an opening date of March 18, 1981, (Plaintiff's Ex. 100).

8. Donald R. Ware (black male), who was then the deputy director of the Position Management and Classification Division of the District of Columbia Office of Personnel learned about the vacancy from the Federal Register that lists federal job vacancies (Tr. 412) and applied on the opening date.[2]

9. Management was unable to fill the position in the time allotted, and the job was approved for reposting as Vacancy Announcement No. 10363 by Louis R. Mortimer (white male) (Plaintiff's Ex. 107 and 145).

10. All applicants were advised of the necessity to reapply for the Position Classification and Organization Officer position and to complete in addition a Supplemental Qualifications Statement (Plaintiff's Ex. 108).

11. Donald Ware reapplied under the reposted vacancy announcement no. 10363 (Plaintiff's Ex. 98).[3]

---

**1.** Position Classification Specialist Mannering is excluded from this calculation: his race is not set forth in the record.

**2.** Since the Federal Register comes out a week ahead of most vacancy opening dates (Tr. 412), applicants are able to apply on the opening date or shortly thereafter. Thus, Mr. Ware's application was dated March 18, 1981, as were the applications of Francis Carroll, a GS–14 applying from the Bureau of Indian Affairs, of Diana Hall, a GS–13, applying from HHS, and of John Wilkinson, a GS–13, applying from the Department of Interior (Plaintiff's Exhibit 99). Several others were able to submit applications dated March 19, 1981: Robert McKenney from the Customs Service, Randall Quartermont from the Immigration and Naturalization Service, and Jane Zodon from the Department of Labor.

**3.** While the Plaintiff alleges (Amended Complaint, para. 4.8) that the reposting enabled Mr. Ware to achieve one year's experience as a D–14 (GS equivalent) before his official appointment in February 1982 this allegation, even if true, is of no importance since the vacancy announcements only required one year of specialized experience at the GS–13 level (Plaintiff's Exs. 100 and 101), and Mr. Ware had many years

12. After screening through a panel[4] Mr. Ware was recommended for selection by the Director of Personnel Louis R. Mortimer (Plaintiff's Ex. 124).

13. Dr. Mortimer's recommendation was approved by Glen A. Zimmerman, the Associate Librarian for Management (Plaintiff's Ex. 124), and he was appointed effective February 22, 1982 (Plaintiff's Ex. 243).

14. Both Dr. Mortimer (Tr. 365) and Mr. Zimmerman are white males.

15. The plaintiff did not apply for the PC & O Officer position (Plaintiff's Ex. 98).

### Creation of GS–15, GS–14 and Two GS–13s Positions

16. As a result of restructuring of the PC & OO positions (Tr. 154), on October 15, 1982, Louis R. Mortimer, white male, the Director of Personnel, regraded the Chief of PC & O's job to the GS–15 level, the Assistant Chief to the GS–14 level, and also approved the GS–13 level recommended for two GS–13 Expert Position Classification Specialists (Plaintiff's Ex. 83, pg. 2, p. 12 and 24 and Plaintiff's Ex. 145, pg. 1). These classification actions were approved by the Association Librarian for Management, Glen A. Zimmerman (white male) (Plaintiff's Ex. 82, p. 2).

17. Over the following weekend, Mr. Zimmerman became concerned that the intervening grade between the full performance level GS–12s and the GS–14 would prevent the GS–12s from being able to compete for the GS–14 position (Tr. 627–8).

18. Accordingly, on the next Monday, October 18, 1982, Zimmerman met with David Lombardo, the Recruitment and Placement Officer, who had reached the same conclusion as Zimmerman, and Zimmerman directed the cancellation of the GS–13s (Tr. 628). As a result, the GS–12s in PC & OO were able to compete for the Assistant Chief position (Plaintiff's Ex. 152).

### Filling of GS–14 Assistant Chief Position

19. Thereafter, the Assistant Chief, Supervisory Position Classification Specialist's job was posted at the GS–14 level (Vacancy Announcement No. 20783, Plaintiff's Ex. 104). While the minimum qualifications required all outside applicants to have one year of specialized position classification experience at the GS–13 level, Library of Congress applicants were considered qualified if they had two years of specialized position classification experience at GS–12 level (Vacancy Announcement No. 20783, Plaintiff's Ex. 104). Forty-two (42) applicants applied, including PC & OO employees Ira Johnson, the plaintiff in this case C. Douglas Slade, as well as Jesse G. Powell (Plaintiff's Ex. 96). Both Johnson (black male) and C. Douglas Slade (white male) at that time were occupying GS–12 non-supervisory personnel classification specialist positions in PC & OO (Plaintiff's Ex. 96). Mr. Powell, at the time of his application, had been filling a GS–13[5] Supervisory Position Classification Specialist position in the D.C. Government for over 2 1/2 years, and actually had been supervising or leading others in classification work for over 8 years (Plaintiff's Ex. 128, p. 2). By contrast, neither Ira Johnson nor the plaintiff, C. Douglas Slade, had ever filled a supervisory position classification position (See Slade's application for GS–13, Plaintiff's Ex. 21 and Johnson's application for GS–13, Plaintiff's Ex. 155). Selectee Jesse Powell, who was then a GS–

experience as a DS/GS–13 (See Plaintiff's Ex. 108).

**4.** While Laura Christian alleged in her affidavit (Plaintiff's Ex. 141, p. 2) that Cox, also employed at PC & OO, gave Dr. Louis Mortimer, the Director of Personnel, *a copy* of Mr. Ware's application, and that consequently Ware was "indebted to Ms. Cox for assisting in his selection," Christian during her testimony, said merely that she saw Cox carrying "a document" out of the office and that she said she was going to the "R

& P" Office (Cox, p. 51). It was not alleged that Ms. Cox had anything to do with this panel and there is no evidence that she had any contact with any of its members or that she was in any way involved in the decision making with regard to the selection of the Chief (Tr. 405–06).

**5.** His actual series and grade in the D.C. Government was DS–221–13, which is comparable to the GS-series in the federal government.

13 position classification specialist, was chosen from a group that included only 3 applicants who were then occupying supervisory position classification specialist positions at the GS–13 or 14 level (Plaintiff's Ex. 96).[6]

20. Both the plaintiff C. Douglas Slade and Ira Johnson[7] were interviewed for the GS–14 position by Mr. Ware (Tr. 65 and 249–50). While the plaintiff alleges that toward the end of his interview for the GS–14 position Mr. Ware said to Mr. Slade that he was obliged to hire a female for the position (Slade, p. 9), plaintiff's witness David E. Hurley (a white male), who was an applicant for the same position, and also interviewed by Mr. Ware, indicated no discriminatory statements by Donald Ware in his interview and he left the interview with a very positive impression (Tr. 154). In fact, Mr. Hurley specifically stated that he thought he would be given serious consideration for the job. Ira Johnson, who was also interviewed for this position by Mr. Ware, testified as to no such statements by Mr. Ware.

21. Mr. Ware's recommendation of Jesse Powell for the Assistant Position Classification Officer position in February 1983, was approved by Louis R. Mortimer (white male) on 2/8/83 ("LRM 2/8/83") (Plaintiff's Ex. 119).

22. No EEO discrimination charges were filed with regard to the selection of Jesse Powell.

23. In June 1982, Mr. Ware also hired Barbara Blackwood as a GS–12 Position Classification Specialist (Tr. 236–37) (Plaintiff's Ex. 70 K). There were 10 applicants for this vacancy but only two applicants were filling position classification specialist positions at the time: Ms. Blackwood and one other (Plaintiff's Ex. 91). Ms. Blackwood was then employed at the District of Columbia. (Plaintiff's Ex. 91).

*Reactivation of GS–13s*

24. Soon after the selection of Mr. Powell, Mr. Ware inquired about the GS–13s being reinstated, but his request was not acted upon because a related issue had been raised in a law suit then pending in court (Tr. 729). When this was resolved at the end of July, 1983 (Tr. 729–30), Mr. Ware reestablished dialogue on the GS–13s (Tr. 730) and wrote to the Director of Personnel, requesting that the GS–13s be reactivated (Plaintiff's Ex. 85). This request was approved by Louis R. Mortimer (white male), the Director of Personnel (Plaintiff's Ex. 85), but he did not approve the actual vacancy announcement request until November 16, 1983 (Plaintiff's Ex. 120).

25. Thereafter, staffing specialist Michael R. Brehmer, a Personnel Staffing Specialist in the Recruitment and Placement Office, (white male) drafted the vacancy announcement (Vac. Ann. No. 31024) for the two GS–13 Expert Position Classification Specialist positions (*See* Defendant's Ex. D). Several days later and before the announcement was actually posted, it was discovered that there was a typographical error on the announcement which the Recruitment and Placement Office considered to be "fatal," and it was cancelled (Tr. 603). This announcement was replaced with the Vacancy Announcement No. 31025 (Defendant's Ex. E), which had the same opening date—December 28, 1983 and the same closing date—January 5, 1984—as the original vacancy announcement. The only difference between the old and new announcements were the correction of the typographical error, and the addition of a brief explanation stating that the original vacancy announcement was cancelled but that qualified candidates under the original vacancy need not reapply (Tr. 604).

26. On the morning of January 5, 1984, the closing date of the vacancy announcement, Mr. Ware asked Mr. Brehmer how many applicants had applied (Tr. 604). When Brehmer told him that one applicant had applied,[8] Mr. Ware said he was not

---

**6.** All three of these GS–13 or 14 supervisory classification specialists were males (Plaintiff's Ex. 96).

**7.** All minimally qualified internal applicants were interviewed.

**8.** There is no evidence that Mr. Ware inquired as to the identity of this applicant or that Mr.

surprised because most of his staff either had been on vacation or was currently on vacation. Mr. Ware suggested that the vacancy announcement remain open for approximately another week to a week and a half (Tr. 605). Mr. Brehmer then extended the closing date to January 16, 1984 (Tr. 605). All 8 of the GS–12s in PC & OO applied (Plaintiff's Ex. 94).[9] The applications of 3 of these applicants were received on the last date for applying: January 16, 1984:

C. Douglas Slade (Defendant's Ex. F)

Elizabeth D. Maloney (Defendant's Ex. G), and

Aurelia LaVerne Cox (Defendant's Ex. L).

27. Vacancy Announcement No. 31025 included as a minimum qualification 3 years of progressively responsible specialized experience in position classification, which demonstrated the ability to provide effective leadership (Defendant's Ex. E). Mr. Ware and Mr. Powell interviewed all the applicants, asking each a set number of questions (Tr. 470–71). In addition, the work histories of all applicants were reviewed—starting with their most recent job (Tr. 470). The work histories were compared with the selection factors (Tr. 471), and then Mr. Ware and Mr. Powell independently ranked the applicants (Tr. 472). Mr. Powell ranked the top 4 applicants as: Barbara Blackwood, Laverne Cox, the plaintiff and Ira Johnson (Tr. 471). Mr. Ware arrived at the same top four, although in different order (Tr. 471).

28. Ware and Powell recommended Barbara Blackwood and Aurelia LaVerne Cox for selection because they had more supervisory experience than the other finalists. What stood out for Ms. Cox was that she had been an acting chief of classification at the University of the District of Columbia for 1 year or better; that she had trained lower graded position classification specialists [10]; and that she had also dealt well with top management (Tr. 473). Ms. Blackwood had been an acting team leader supervising 4 GS–8 and GS–11 (two at each grade) position classification specialists (Defendant's Ex. M and Tr. 473); she had also had technical experience developing standards and had performed well in dealing with top level management (Tr. 472–73).

Plaintiff had no comparable leadership experience in assigning work to, or planning work for other position classification specialists, (Tr. 736). While serving at HEW, the plaintiff was assigned for 7 days in 1979 as an Acting Chief of a group performing a mixture of classification, staffing and employee relations work (Defendant's Ex. F, Memo dated Jan. 30, 1979, /s/ Pauline O. Nordstrom). The plaintiff had no experience providing training to lower rated staff (Tr. 737).

29. Mr. Ware's recommendations were reviewed by at least 3 persons: Mr. Brehmer, Dr. Mortimer and Mr. Zimmerman. In his review of the Personnel Action Recommendations ("PARs"), Michael Brehmer, (white male), the staffing specialist assigned, found that the reasons stated for

Brehmer volunteered this information. According to the dates on the applications, the only application received by the end of the day on January 5, 1984, were from Ray E. Parker (Defendant's Ex. J)—Date Received: Dec. 23, 1983 —and Ira Johnson (Defendant's Ex. K)—Date Received: Jan. 5, 1984.

**9.** Of these, 5 had reached the GS–12 grade prior to Mr. Ware's coming on board: Ray Parker (white male)—5/15/72; the plaintiff, Douglas Slade (white male)—10/15/79; Laura A. Christian (black female)—2/23/81; Ira Johnson, Jr. (black male)—6/16/80; and A. Laverne Cox (black female)—3/23/81 (Plaintiff's Ex. 70 K for dated). The latter two were hired by Alice Riley, a white female (Plaintiff's Ex. 145), from

the District of Columbia Government. The three others reached their GS–12 grade level under Mr. Ware: Barbara Blackwood (black female)—hired 6/14/82; Debra Ann Smith (black female) promoted 8/23/82 and Elizabeth D. Maloney Wulkan (white female)—promoted 12-27-82 (Plaintiff's Ex. 70 K).

**10.** Ms. Cox had been assigned to perform training at the Library of Congress by Mr. Ware's predecessor, Alice Riley, a white female (Ware, p. 203). What stood out in Mr. Ware's mind about this assignment was that Alice assigned Ms. Cox, a GS–11, to do this training rather than GS–12s that were previously on board: Ms. Christian, Mr. Johnson, Mr. Parker and the plaintiff (Tr. 744–45).

the selections of Cox and Blackwood conformed to the stated selection criteria (Defendant Exs. N and O). Going up the chain of command, Dr. Mortimer, white male, approved both recommendations (See "LRM 3/26/84" on Defendant Exs. N and O). And after a review of the whole selection package, including the applications of the other applicants (Tr. 687), Glen Zimmerman, the Associate Librarian for Management (white male) (Tr. 629), concluded that the two selectees were well qualified for the jobs.[11] (Tr. 630).

### The Allegations In Slade's Discrimination Complaints

30. All 6 of the non-selected GS–12s filed EEO complaints (Plaintiff's Ex. 185, p. 4) concerning the selection of Cox and Blackwood. The plaintiff filed an allegation of discrimination at the informal stage and alleged that the selection was tainted by race, sex and age discrimination (Plaintiff's Ex. 31). This was formalized in a complaint alleging the same basis of discrimination (Plaintiff's Ex. 28), with color subsequently added as a fourth basis of discrimination (Plaintiff's Ex. 23).[12] In support of these allegations, the plaintiff criticized the work of the two selectees (Tr. 34), alleged that their work subsequent to their selection has been no different than that of the GS–12s (Tr. 36), alleged that the GS–13 vacancy announcements were issued shortly after Cox and Blackwood returned from maternity leave (Tr. 68), alleged that the title "expert" for a GS–13 position does not appear in the OPM regulations (Tr. 69), and said that some managers preferred to work with the plaintiff, rather than Mr.

Ware (Tr. 127). Plaintiff offered evidence of two statements to indicate overt sexism or racism by Mr. Ware: (1) the first was a statement made by Mr. Ware after the interview with Slade for the GS–13 position: "You know, I have got to hire a female for this position" (Tr. 71); and (2) the second was a statement attributed to Ms. Cox that Mr. Ware never had hired any whites (Tr. 64).

31. The first allegation is similar to one Mr. Slade made in his two affidavits (Plaintiff's Exs. 20 and 22), but this alleged statement by Slade about Ware is not recorded in the EEO Counselor's report, based on her interviews with Mr. Slade in connection with his non-selection for the GS–13 position (Plaintiff's Ex. 66).[13] While Counselor Thomas reports that Slade alleged that Ware made a statement in connection with his interview for the *GS–14 Assistant Chief job* that: "If I don't hire a woman for [Assistant Chief] job, I am going to be in trouble," no such statement was reported by Slade to the EEO Counselor in connection with his interview for the GS–13s. In fact, Slade reported to the Counselor that his interview for the GS–13 "went well." (Counselor's Report, March 15, 1985, Plaintiff's Ex. 66, p. 4, line 13).[14]

32. Laura Christian testified on rebuttal in this court that race was a factor in the selection of Cox and Blackwood and that no white male had a chance, and that sex also was a factor (Tr. 768–69). In contrast, during her deposition, Christian stated that friendship was the basis for the selection of Cox and Blackwood (Christian, Tr. 769, quoting from her deposition, p. 144, 1. 9–21). In her affidavit, Christian pointed out that she believed that Mr. Ware created the

---

**11.** While Mr. Zimmerman did not interview the applicants he knew them in this particular case (Tr. 689).

**12.** Age was dropped as a basis for the plaintiff's claim of discrimination (Slade, p. 15).

**13.** This counselor is the same one about whom it was said: "I have been told at least two dozen times about long reports written in counselling events. No one has ever mentioned the fact that *this person* is *extremely detailed,* and these lengthy reports have never hurt a single soul ... The staff person was accused of investigating, of

not knowing her job. Well, that may be said but it is not true. The person's work is superb *and thorough ...."*

"Now concerning [the] long reports of Ms. Thomas. I have addressed this subject earlier" (Emphasis added). (Plaintiff's Ex. 259, pp. 6, 10) (under seal).

**14.** A copy of this report was sent to Slade on April 25, 1985 and was apparently received by him on that date (Plaintiff's Ex. 66, p. 1) (upper right of pg. 1 states: "Final counsellor's report Rcv'd April 25th, 1985").

GS–13 position to reward Ms. Cox and Ms. Blackwood (Plaintiff's Ex. 141, p. 2). Johnson testified on rebuttal that race was the factor in the selection, and that no white had a chance (Johnson, p. 210), but in his earlier affidavit Johnson swore that: "I cannot help but feel that the selection of Ms. Cox was some kind of payoff by Mr. Ware (for her assistance in informing Mr. Ware of the position at LC)" (Plaintiff's Ex. 152, p. 3). Gartmon testified on rebuttal that race and sex were a factor in selection of Cox and Blackwood (Tr. 772), but during her deposition she testified that the basis of the selection of Cox, Blackwood and Powell was that they had worked with Mr. Ware before Mr. Ware came to the Library of Congress (Tr. 774 quoting from her deposition on February 19). Elizabeth Maloney testified that she believed Cox and Blackwood were promoted because they were black and because they were friends (Maloney, p. 162), and she initially testified upon questions from the Court that she thought they were promoted because they were friends of Mr. Ware's (Tr. 579–80, lines 9–11 and Tr. 587, lines 15–17).

33. As to the statements attributed to Ms. Cox that Mr. Ware would not hire whites [15], none of these statements were reported to the EEO Counselor, who interviewed the plaintiff, Laura Christian, Annie L. Gartmon, Ira Johnson, Elizabeth Maloney, Louis R. Mortimer and Debra Anne Smith. (Plaintiff's Ex. 66).

34. Furthermore, none of these statements by Ms. Cox were allegedly attributed to, or adopted by, Mr. Ware himself.

35. Moreover, Mr. Ware testified without contradiction that while he was at the District of Columbia government he selected at least one white male, a Mr. Nelson, for a position classification specialist position (Tr. 731–32). During his tenure at the Library of Congress, for Elizabeth Maloney (white female) was promoted twice. Mr. Ware's request that the GS–13 vacancy announcement closing date be extended enabled both Elizabeth Maloney (January 16, 1984, Defendant's Ex. G) and the plaintiff to apply (January 16, 1984, Defendant's Ex. F).

### Alleged Retaliation: Note of Proposed Adverse Reaction

36. On October 14, 1983, the Director of Personnel notified all staff of the Personnel and Labor Relations Office, including PC & OO, that there was reason to believe that staff members had been reviewing official files of the Personnel Office which did not relate to the performance of their duties (Plaintiff's Ex. 87, Attachment B). He reminded them of the long-standing policy of the Office that restricted access to such materials to persons who must use them in the course of their work. He warned that violations of this policy could result in disciplinary action. *Id.*

37. Two days following the filing of his initial allegation of discrimination,[16] Mr.

---

15. The plaintiff alleged in his testimony in this Court that he overheard such a statement (Tr. 64 and 117), but no such statements were contained in the affidavits from the plaintiff secured by the investigator (Plaintiff's Exs. 20 and 22). Those who testified they heard Cox make such a statement varied in when and where and what was said. Christian for example, first alleged there was one conversation in "late 1982 (sic) prior to Mr. Ware's arrival," at which only two other persons were present (Plaintiff's Exs. 141 and 142). By the time Christian testified in this Court, the number of persons who heard the conversation had grown (from two to five), the number of times the statement was made had grown (from one to two occasions or more when conversations like this occurred, Christian, p. 39), and the substance of the conversation had been expanded (from "other departments had promoted white males, it was our

time" (Christian, p. 40), to "we didn't have to worry about ... *whatever way the LOC had oppressed us—he was going to turn it around"* Christian, p. 41), to "Cox made statements about Ware's record of hiring at LOC" (Christian, p. 41), but she doesn't testify what the actual statements were. When she testified about this alleged statement by Cox, Gartmon stated it had to be in 1981, since it was allegedly made before Ware applied, and was in the *future* tense: "Donald will never hire a white" (Gartmon, p. 83), whereas in her affidavit Gartmon swore the conversation was in 1982 and was limited to the *past* tense: "when he was in the District of Columbia Government, he didn't hire whites" (Plaintiff's Ex. 183).

16. Slade's initial allegation of discrimination in connection with the selection of Cox and Black-

Slade was observed by Ralph Adams, the Personnel Operations Officer, in the process of making an unauthorized review of the Office Personnel Folder ("OPF") of Position Classification and Organization Office staff member, LaVerne Cox, one of the selectees for the disputed GS–13 position. (Plaintiff's Ex. 87, Attachment A). In his initial report with regard to this incident, Mr. Adams stated:

> I ... informed him [Mr. Slade] he did not have the right to review her OPF. He asked, 'why not.' I stated, 'Are you reviewing it for official purposes?' He stated he really was not, so I asked for the OPF and told him unless it was for official purposes he should not be reviewing it. He agreed and gave me the file.

Plaintiff's Ex. 87 (Attachment A).

38. This matter was assigned to Leonard Scott (black, male) for an administrative inquiry. He conducted an inquiry to determine whether grounds for a proposed adverse action existed (Tr. 719). Mr. Slade took the position he was authorized to review the OPF of LaVerne Cox with respect to a matter on which he had already gone to see an EEO Counselor, and furthermore, that he had never been informed that he did not have the right to review employee personnel folders (Plaintiff's Ex. 87, Attachment D). Mr. Scott concluded that a journeyman professional classifier such as Mr. Slade should have known that he should not have looked at Ms. Cox's OPF, and that he also should have received a copy of the October 14, 1983 notice (Plaintiff's Ex. 87, C) warning that unauthorized access to personnel files could result in discipline (Tr. 716). There is no evidence in this record that Mr. Scott had any knowledge of the EEO charges filed by plaintiff with respect to his non-selection. Thereafter, on May 30, 1984, Peter J. Watters, white male, issued the proposed adverse action (Plaintiff's Ex. 87, p. 1–2).

39. On the same day, the plaintiff filed a complaint of discrimination alleging reprisal by Peter Watters (white male) and Leonard Scott (black male) because of his filing of the earlier informal complaint alleging non-selection for Vacancy Announcement No. 31025 (Plaintiff's Ex. 35). The plaintiff also claimed that he was discriminated against because a disciplinary action was proposed against him and not proposed for black employees under similar circumstances (Plaintiff's Ex. 35, p. 2).

40. The official who issued the proposed adverse action, Peter J. Watters (white male), had not been named as an alleged discriminating official by the plaintiff in his allegation of discrimination filed on April 9, 1984 (See plaintiff's Ex. 31). Furthermore, there was no evidence of any prior dealings or hostility between the plaintiff and Mr. Watters.[17] There was no evidence that either Mr. Ware or Mr. Powell, the alleged discriminatory officials, exerted any influence on Mr. Watters' issuance of the proposed adverse action.

### Alleged Retaliation: Delay in Processing EEO Complaints

41. The plaintiff alleges that his allegations and complaints of discrimination were accepted by the defendant's EEO Office for processing, but that they failed to meet processing deadlines and that this failure was a form of retaliation against plaintiff (AMENDED COMPLAINT, para. 4.16). The plaintiff also alleged that a conflict of interest by the Chief, EEOCO, adversely affected processing of his complaints (*Id.* para 4.17). The processing of plaintiff's complaint was delayed, but there is no evidence that the delay reflected a decision to retailiate against the plaintiff.

42. On March 29, 1984, Mr. Slade filed an informal complaint of discrimination

---

wood was filed on April 9, 1984 (Plaintiff's Ex. 31).

**17.** If anything, the evidence shows that Watters, in internal discussions of the processing of EEO complaints by the Library, the Library, championed the plaintiff's case, by pointing out that there had been long delays in completing the

informal counseling in plaintiff's case (Plaintiff's Ex. 204, pg. 2, paragraph 2). When the reply officer did not respond in over a year, the Director of Personnel dismissed the proposed adverse action, because of the extended period of time that had elapsed since the action was proposed (Defendant's Ex. W).

with respect to his non-selection for the position of Expert Position Classification Specialist GS–13 (Plaintiff's Ex. 66 at 1–2). He was interviewed at this time by the Chief of the EEO Office, Alfred E. McEwen. During the interview, the plaintiff appeared agitated and stated that personnel in the EEO Office engaged in discrimination. (Tr. 507). Mr. McEwen told plaintiff that the EEO Office would give him the best support they could muster (Tr. 507). The plaintiff then asked Mr. McEwen what he needed to be successful in his case and Mr. McEwen said a good representative, and gave him the name of three (3) persons, including attorney Irving Kator (Tr. 489).

43. Thereafter, beginning on at least April 9, 1984,[18] (Plaintiff's Ex. 71), and continuing until at least September 24, 1985 (Plaintiff's Ex. 56), the plaintiff was represented by Irving Kator, Esquire.

44. On the day after lodging his informal complaint, March 30, 1984, the plaintiff met with EEO Counselor, Doreena A. Thomas, (Plaintiff's Ex. 66, p. 2).

45. After interviewing Donald Ware, Jesse Powell, Laura Christian, Annie L. Gartmon, Ira Johnson, Jr., Elizabeth Maloney, Debra Ann Smith, and Louis R. Mortimer, the EEO counselor was advised by Dr. Mortimer (white male) on September 18, 1984, that it was inappropriate to settle plaintiff's complaint (Plaintiff's Ex. 66, p. 1, p. 7).

46. On September 19, 1984, the plaintiff was advised of the EEOCO's inability to resolve this complaint and of his right to file a formal complaint (Plaintiff's Ex. 66, p. 7).

47. On October 3, 1984, plaintiff filed his formal complaint of discrimination (Plaintiff's Ex. 23), naming as alleged discriminating officials Jesse Powell and Donald Ware.

48. There was no evidence of any attempt by anyone to delay or impede the plaintiff's case during the informal stage. In fact, Lloyd A. Pauls, the Assistant Chief, EEO Complaints Office, and Doreena A. Thomas, the EEO Counselor, made further attempts to resolve this complaint, after the informal stage and continuing until some time after January 15, 1985 (Plaintiff's Ex. 66, p. 7–8).

49. On March 15, 1985, the EEO Counselor issued her formal EEO Report (Plaintiff's Ex. 66).

50. On April 25, 1985, a copy of the Counselor's Report was transmitted to the plaintiff (Plaintiff's Ex. 66, cover page).

51. On April 25, 1985, investigator James E. Hatcher (white male) was assigned to investigate plaintiff's complaint (Plaintiff's Ex. 48).

52. Mr. Hatcher interviewed 14 witnesses in an investigation concluded on November 25, 1985 (Plaintiff's Ex. 48).

53. There was no allegation or evidence that Hatcher took any steps to delay plaintiff's case.

54. Except for one telephone conference with the agency in the early stages of the administrative process (in May, 1984), plaintiff's attorney Mr. Kator appears to have made only one other contact with a Library of Congress official. This was in the Spring of 1985 (see Plaintiff's Ex. 226) and it was not concerned with delay in the handling of Mr. Slade's case (Tr. 491–92). As Mr. McEwen recalled this conversation, Mr. Kator asked Mr. McEwen if the LOC could adjust plaintiff's case (Tr. 491–92). Mr. McEwen later responded to Mr. Kator and told that the LOC was not at the stage to attempt a settlement (Tr. 492) (one other contact with Kator did not deal with the merits of the Slade case *per se* ).[19]

---

18. Beginning in August 1984, Mr. Kator also represented Mr. McEwen (Tr. 489) in connection with an EEO complaint that he filed outside the normal EEO procedures against the Library of Congress; this complaint alleged that the Library of Congress was not letting Mr. McEwen do his job; it was resolved in June, 1985 (Plaintiff's Ex. 302 (under seal)).

19. In this conversation in 1985, after McEwen had recused himself (Tr. 506), Mr. Kator told Mr. McEwen that he was unhappy with anybody recommending him to represent anyone at the Library and he never wanted to be recommended again, and he also told Mr. McEwen that he was no longer representing Mr. Slade (Tr. 492).

55. Aside from his initial interview with Mr. Slade in 1984 (Tr. 491), Mr. McEwen had no contact with the plaintiff until December 5, 1985 (Plaintiff's Ex. 75 (third paragraph), and Tr. 507).

56. On or about December 5, 1985, or 10 days or so after Mr. Hatcher completed his investigation, Mr. McEwen had an encounter with the plaintiff in the hall in which the plaintiff, accused Mr. McEwen of not handling his complaint properly (Tr. 501), and also indicated displeasure with Mr. Kator's handling of his complaint. (Plaintiff's Ex. 75 (third paragraph)). Mr. McEwen then recused himself from reviewing the plaintiff's complaint when it reached his level (Plaintiff's Ex. 73).[20]

57. There is no evidence that Mr. McEwen actually ever handled the plaintiff's original complaint either before or after December 5, 1985, except for the initial interview.[21] There is likewise no evidence that Mr. McEwen influenced or attempted to influence their handling by others.

58. There is no evidence that Mr. McEwen or his staff received instructions from anyone to hold up the processing of the plaintiff's EEO complaints (Tr. 561 636).

59. There is no evidence that Mr. McEwen himself ever gave instructions to hold up or slow down plaintiff's complaints (Tr. 561).

60. While plaintiff experienced delays in the processing of his EEO complaints at the hands of the Library's EEO office, with the result that that office was not able to meet time targets set forth in the Library's regulations, there is no evidence that these delays or failures to meet time targets were unique to the plaintiff, and/or were not experienced generally by all Library employees.

61. In April 1985, RBP Associates was awarded a contract to study the Library of Congress' total equal employment opportu-

nity efforts (Defendant's Ex. II(1), Part 1, Sections 1–4, p. 1). The study focused in part on the processing of EEO complaints by the Library's EEO Office ("EEOCO").

62. Individual interviews with management, LOC employees and EEO staff, revealed that the processing of complaints in general was slow, but they never revealed that the EEOCO Chief or LOC management gave instructions to slow down or otherwise interfere with individual EEO complaints. (Defendant's Ex. II(1) Part 1: Section 1–4 pp. III 119–122). (hereinafter "Patterson Report").

63. At the time of the filing of the complaint in this court on June 20, 1986, the original informal complaint ("filed" March 29, 1984), had been pending for *two (2) years and three (3) months*, and the formal complaint ("filed" October 3, 1984) had been pending for approximately *623 days*.

64. This compares with the Patterson Report finding that the average time for processing *formal complaints* at the Library of Congress was in excess of *four years* (Defendant's Ex. II(1) (blue book)) (p. II–118) (Defendant's Ex. II(1) (red book)) (p. III–120). An analysis by RBP Associates of the longest and shortest pending complaints in the EEOCO shows no pattern by race and sex (Tr. 638).

65. While one of the black female's (Debbie Smith's) complaint was settled (Plaintiff's Ex. 202), this settlement was reached in special circumstances including a lateral transfer for the complainant, without any promotion or backpay, relief falling far short of that sought by the plaintiff (See Plaintiff's Exhibits 23 and 28). Moreover, this agreement was reached only with the approval of Louis R. Mortimer (white male), Director of Personnel, who was also one of the two persons who made the decision not to settle plaintiff's complaint at the informal state (Plaintiff's Ex. 66, p. 7). The other person who made the decision

---

20. Up until the point when Mr. McEwen recused himself in December 1985, the record reflects no complaints by the plaintiff nor by his counsel Mr. Kator, about delays by the EEOCO in handling plaintiff's complaint.

21. There is likewise no evidence that Mr. McEwen ever handled the plaintiff's retaliation allegation filed on May 30, 1984 (Plaintiff's Ex. 34).

not to settle plaintiff's complaint was another white male: Glen A. Zimmerman (Plaintiff's Ex. 202).[22]

### Alleged Retaliation Against Witnesses Favorable to Plaintiff

66. On February 11, 18 and 19, 1987, plaintiff's counsel deposed, respectively, Laura A. Christian, Ira Johnson, Jr. and Annie L. Gartmon, a classification assistant in PC & OO (AMENDED COMPLAINT, paras 4.19 and 4.21).

67. The plaintiff alleges that: (1) their testimony was favorable to the plaintiff, (2) that the Director of Personnel knew this, and (3) that he accordingly, with the approval of Glen A. Zimmerman, the Associate Librarian for Management, took action against two of these three in the form of investigating their signatures on sign-in sheets (AMENDED COMPLAINT, para 4.22), delivery to them on February 19, 1987 of memorandums to report to the Director of Personnel (*Id.* at Par. 4.23), and by telling them that on March 2, 1987 that adverse action could be brought against them "in the future" (*Id.* at par. 4.25), with the intent of retaliating against them for giving testimony favorable to the plaintiff (*Id.* at par. 4.28).

68. On or about February 19, 1987, as an aftermath of an investigation of signature irregularities on attendance records in the PC & O Office,[23] Mr. Robert Davis, executive assistant to the Director of Personnel, was asked by Helen Sullivan, an attorney in the Office of Counsel for Personnel, to obtain *time-and-attendance records* for three (3) individuals (Christian, Gartmon and Johnson) in PC & OO. (Tr. 704).

69. Mr. Davis (white male) secured the records, and gave them to Ms. Sullivan without reviewing them (Tr. 706).

70. Mr. Davis was not aware that Ms. Sullivan had any knowledge of deposition testimony or the fact of the depositions of Annie Gartmon, Ira Johnson or Laura Christian in February, 1987 (Tr. 704–05). No evidence was introduced to show that she had.

71. In a separate matter in February Mr. Davis who had finished his investigation of signature irregularities of the supervisor in PC & OO on the *sign-in sheets*, turned his attention to sign-in irregularities in connection with the signatures of other PC & OO employees (Tr. 699). Irregularities appeared in connection with the signatures of Annie Gartmon and Ira Johnson (Tr. 699). (Irregularities were present in connection with the signatures of Christian, but they did not appear to be as extensive as those in connection with the other two (Tr. 707)).

72. Accordingly, on February 19, 1987, Robert Davis, in continuation of the investigation, drafted letters to Gartmon and Johnson (Defendants Exhibits X and Y), asking them to report to the Director of Personnel to discuss the situation (Tr. 705).

73. At this time in February, 1987, Davis was not aware of any deposition testimony by Gartmon or Johnson (Tr. 699–700).

74. The issuance of the memoranda to Gartmon and Johnson had nothing to do with the fact that these individuals had given deposition testimony in this case, (Tr. 699).

75. In their meetings with the Director of Personnel, Gartmon and Johnson admitted that they had sometimes signed in for other persons (Defendant's Exs. EE and FF), in violation of a Library of Congress regulation.

76. While this conduct was serious, Director of Personnel Mortimer decided not to issue proposed adverse actions, because

---

**22.** While plaintiff alleges that the settlement of the EEOCO Chief's EEO complaint evidence disparate treatment, that complaint was clearly distinguishable: (1) the Chief EEO complaint did not grow out of the same or similar circumstances as that of the plaintiff; and (2) his complaint was not processed by the same office that handled the plaintiff's complaint, since, of course, Mr. McEwen's own staff could hardly be expected to act upon his complaint.

**23.** This investigation had commenced many months before the deposition testimony of Laura Christian, Annie Gartmon and Ira Johnson (AMENDED COMPLAINT, para 4.27).

it was condoned by their supervisor, and instead issued admonishments to both Gartmon and Johnson. (Defendant's Exs. EE and FF.)

77. Neither Mortimer (white male) nor Davis (white male) had participated in the depositions of Gartmon or Johnson, nor had they been named as alleged discriminatory officials in the plaintiff's own complaint. Davis, who drafted the February 19, 1987 letters, was not aware of the deposition testimony of Gartmon and Johnson at the time of drafting and issuing the letters. Dr. Mortimer, who actually signed them, was not shown to be aware of any such testimony. Nor is there any evidence in this case that Mortimer was aware of the deposition testimony of Gartmon and Johnson at the time of his issuance of the letters of admonishment in July and August, 1987. (Gartmon admits that at the time of her interview with Dr. Mortimer, Mortimer never indicated any awareness of her deposition testimony (Tr. 348)). In fact, Davis, who participated in the meetings to decide upon the admonishments, testified without contradiction that the deposition testimony of these individuals played no role in the issuance of the admonishments to Gartmon and Johnson (Tr. 700–01). Moreover, the investigation that resulted in the admonishments of Gartmon and Johnson had been ongoing since 1986,[24] well in advance of the deposition testimony of Gartmon and Johnson.[25]

### Court Leave

78. The plaintiff has charged the Library of Congress with petty harrassment for denying him court leave for two (2) hours of time charged against him as annual leave on April 15, 1987 (Plaintiff's Ex. 242).

79. The Library of Congress allows an employee court leave for his or her actual time in court, plus a reasonable amount of time to travel to and from the courtroom; any time beyond that is charged to annual leave (Tr. 702).

80. The plaintiff claimed court leave for some time spent out of the office in connection with this case on April 15, 1987 (See Plaintiff's Ex. 242).

81. Mr. Davis went to the Office of the General Counsel to verify the plaintiff's attendance and found out that the plaintiff had been in court on the day in question, but not for the full time claimed (Tr. 703).

82. Mr. Davis allowed the plaintiff court leave for his actual time in court, plus transportation at either end of the court time, but denied court leave to the plaintiff for 2 hours of time outside these guidelines (Plaintiff's Ex. 242).

83. The procedure followed by Mr. Davis in this particular case did not deviate in any way from the practice of the Library (Tr. 703).

84. Mr. Davis was not named as an alleged discriminating official in connection with plaintiff's prior complaints.

There is no evidence to show that those officials exerted any influence on Mr. Davis in connection with his denial of court leave to the plaintiff.

### III. CONCLUSIONS OF LAW

#### Applicable Law

■ 1. Section 703 of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e–2, prohibits discrimination in employment on the basis of race, color, religion, sex or national origin. The Act specifies that it is unlawful, Sec. 2000e–2(a)(1):

"... to fail or refuse to hire or to discharge any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color ... [or] sex ..."

Title VII applies to all people, of all races, and both sexes. *Griggs v. Duke Power*

---

**24.** See, e.g., Davis' report to Mortimer of October 10, 1986, which while centering on sign-in irregularities with respect to the signature of the supervisor, also noted "variations in the signatures of other employees as well." (Plaintiff's ex. 282, first page, last line).

**25.** As for the treatment of similarly situated employees in PC & OO, Donald Ware, a defense witness and alleged discriminatory official, was dealt more severe proposed discipline for participation in the same incidents than Gartmon and Johnson (Plaintiff's Ex. 286, April 16, 1987).

*Co.,* 401 U.S. 424, 430–31, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971). "Preferring members of any one group for no reason other than race ... is discrimination for its own sake. This the Constitution forbids." *Regents of University of California v. Bakke,* 438 U.S. 265, 307, 98 S.Ct. 2733, 2757, 57 L.Ed.2d 750 (1978). *See also, Turgeon v. Howard University,* 571 F.Supp. 679, 685 (D.D.C.1983) ("Title VII actions may be maintained by white individuals"); *Lucero v. Beth Israel Hospital and Geriatric Center,* 479 F.Supp. 452, 455 (D.Colo. 1979) (black supervisor's deliberate and willful discrimination against non-black employees violated Title VII and Section 1981).

2. Plaintiff alleges that the discrimination to which he was subject took the form of disparate treatment. "The central focus in a Title VII disparate treatment case such as this is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex or national origin.' " *Furnco Construction Corp v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), quoting *Teamsters v. United States,* 431 U.S. 324, 355 n. 15, 97 S.Ct. 1843, 1864 n. 15, 52 L.Ed.2d 396 (1977).

■ 3. To establish a *prima facie* case of discrimination on the basis of disparate treatment, a "plaintiff must prove by a preponderance of the evidence that [he] applied for an available position, for which [he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *accord, McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed. 2d 668 (1973); *McDonald v. Sante Fe Trail Transportation Co.,* 427 U.S. 273, 278–80, 96 S.Ct. 2574, 2577–79, 49 L.Ed.2d 493 (1976); *Aikens v. United States Postal Service Board of Governors,* 642 F.2d 514 (D.C.Cir.1980), *rev'd* 453 U.S. 902, 101 S.Ct. 3135, 69 L.Ed.2d 989 (1981), *aff'd on remand,* 665 F.2d 1057 (D.C.Cir.1981), *rev'd,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403

(1983). A minority individual "may adequately demonstrate such circumstances simply by showing membership in a minority group." *Bishopp v. District of Columbia,* 788 F.2d 781, 786 (D.C.Cir.1986) citing *McDonnell Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at 1824. White male plaintiffs, however, must present evidence "apart from their race and sex" to show that their non-selection was a reflection of unlawful discrimination. *Bishopp,* 788 F.2d at 786.

■ 4. Once a plaintiff has put forth a *prima facie* case, an employer need only shoulder the burden of production that the plaintiff's non-promotion was unrelated to discrimination. This burden is satisfied when the employer "explains that it has done or provides evidence of legitimate non-discriminatory reasons." *Board of Trustee of Keene College v. Sweeney,* 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 296 n. 2, 58 L.Ed.2d 216 (1978). The employer's burden is not one of persuasion. Indeed: "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated or [retaliated] against the plaintiff." *Burdine, supra,* 450 U.S. at 254, 101 S.Ct. at 1094.

5. "If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted, and the factual inquiry proceeds to a new level of specificity." *Burdine,* 450 U.S. at 254, 255, 101 S.Ct. at 1094, 1095. Plaintiff must then set about to meet her "ultimate burden of persuading the court that she had been the victim of intentional discrimination" or retaliation. *Id.*

■ 6. It is insufficient for the plaintiff to merely show that the defendant's proffered reason is not the true or entire explanation for the decision. In other words, the burden of proving pretext is not simply met by refuting the defendant's articulated reason. *White v. Vathally,* 732 F.2d 1037, 34 FEP Cases 1130, 1134 (1st Cir.1984), *cert. denied* 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 267 (1984). The plaintiff must, in addition, demonstrate discriminatory intent. *White, supra,* 732 F.2d at 1040, 34 FEP Cases at 1134;

The issue of the proper intent standard and that of pretext overlap because plaintiff's burden of showing pretext "merges" with the ultimate burden of demonstrating unlawful discrimination. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McWilliams v. Escambia County School Board*, 658 F.2d 326, 331, 27 FEP Cases 269 (5th Cir.1981) (Unit B). Only when defendants' articulated reason is pretext *"for accomplishing a racially discriminatory purpose"* will the plaintiff recover. *Watson v. National Linen Service*, 686 F.2d [877] at 881 [ (11th Cir.1982) ]. The Court thus may not circumvent the intent requirement of the plaintiff's ultimate burden of persuasion by couching its conclusion in terms of pretext; *a simple finding that the defendant did not truly rely on its proffered reason, without a further finding that the defendant relied instead on race will not suffice to establish Title VII liability.* (Emphasis added.)

*Clark v. Huntsville City Board of Education*, 717 F.2d 525, 529, 33 FEP Cases 15, 18 (11th Cir.1983).

### Analysis

7. Plaintiff established the first three elements of his *prima facie* case. Plaintiff applied for the GS–13 position; plaintiff had at least "minimum objective qualifications" for promotion;[26] and plaintiff was rejected for the position.

■ 8. The dispute in this case centers whether plaintiff supplied sufficient particularized evidence apart from his race and sex, to show that he was rejected for the GS–13 position under "circumstances which give rise to an inference of unlawful discrimination." *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1093. The Court finds that plaintiff did not carry this burden.

9. There is no evidence in the instant case of "irregular" acts of favoritism towards minority employees. The acts of promoting Cox and Blackwood were entirely regular. While plaintiff implies that the cancellation of the original posting and its extension were irregular, the facts show that the cancellation of the original vacancy announcement for the GS–13s—Vacancy Announcement No. 31024—was to correct a typographical error on the original announcement (Tr. 603); the extension of the reposted vacancy no. 31025 was done to afford more applicants the ability to apply (Tr. 604–05), and was done without knowledge as to who had applied.[27] Moreover, the holding-off of the original postings for the GS–13s until December 28, 1983 (opening date on both Vacancy Announcement No. 31024 and 31025), enabled white female applicant GS–12 Elizabeth D. Maloney (See Defendant's Ex. G), to meet the one-year time-in-grade requirements.[28] Finally, staffing specialist Mike Brehmer (white male), testified without contradiction, that the stated reasons for the selections conformed to the stated criteria (Tr. 607). No evidence was produced to show that LOC regulations were not followed in the case of the selection of the GS–13s.[29]

10. As for showing a disproportionate promotion of blacks, there is insufficient evidence to support this inference. The recommending official in this case, Mr. Ware, was black. Mr. Ware had initially hired Ms. Blackwood, one of the selectees, into the Library and had hired a black

---

26. *Davis v. Califano*, 613 F.2d 957, 964 (D.C.Cir. 1979).

27. Moreover, the extension afforded the plaintiff the the opportunity to apply for the vacancy —his application was dated on the next to the last day of the extension period, with his application being logged into the recruitment and personnel office or the last day—(See Defendant's Ex. F, pg. 1, "DATE RECEIVED: JAN 16, 1984").

28. Both vacancy announcements required one year time-in-grade as a GS–12 (See Vacancy Announcement No. 31024, pg. 2 (Defendant Ex. D) and Vacancy Announcement No. 31025, pg. 2 (Defendant Ex. E)). Maloney was first promoted to a GS–12 on December 27, 1982 (See Plaintiff's Exhibit 70K). Maloney therefore just met the one-year time-in-grade requirement.

29. While the selection officials for the GS–13s discarded their interview notes, the Library's regulations do not require that they be used or kept (Tr. 469). In addition, while reference checks were not made on the non-selectees, the Library's regulations, again, do not require reference checks of non-selectees (Tr. 646, 650–51).

assistant chief (Mr. Powell) in addition to selecting Ms. Blackwood and Ms. Cox, also black, for the two GS–13 position classification specialists in question. However, all of Mr. Ware's selections were reviewed by his white male superiors. In addition, Mr. Ware has previously promoted at least one white male while employed at the District of Columbia, has approved the promotions of one white female position classification specialist, and agreed to hire a white secretary. The fact that the initial selecting official is black is by itself insufficient to raise the suspicion that defendant discriminates against the majority. See *Plummer v. Bolger,* 559 F.Supp. 324, 329, 37 FEP Cases 262 (D.D.C.), *aff'd* 721 F.2d 1424, 37 FEP Cases 280 (D.C.Cir.1983).

11. Thus the background circumstances are insufficient to support the suspicion that the defendant is the unusual employer that discriminates against majority employees. Cf. *Turgeon v. Howard University,* 571 F.Supp. 679, 32 FEP 925, 929 (D.D.C. 1983).

■ 12. Even if plaintiff had carried his burden of establishing a *prima facie* case of discrimination, the defendant has clearly articulated a legitimate nondiscriminatory reason for non-selecting the plaintiff. See *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. The selecting official, Mr. Ware, pointed out that selectees Cox and Blackwood, in addition to having many years of technical experience, had demonstrated the ability to get along with top level management and the ability to provide effective leadership to other position classification specialist, both having served in positions requiring them to exercise this leadership (Defendant Exhibits N and O). Mr. Ware at that same time identified Mr. Slade's relative lack of experience in leading other position classification specialists as a weakness. Mr. Ware's supervisors concurred in his judgment. *See* Findings of Fact, *supra,* at par. 29. These reasons for the selection of Cox and Blackwood are articulations of legitimate, nondiscriminatory reasons for not selecting the plaintiff. This placed the burden on plaintiff to "demonstrate by a preponderance of the evidence by the defendant was not its true reason but rather a pretext for discrimination." *Lanphear v. Prokop,* 703 F.2d at 1314.

13. The plaintiff has not carried this burden. The plaintiff has not shown either that the proffered reason for selections were a sham, or that the real reason for the non-selection was prohibited discrimination, as required by *White, supra,* and *Clark, supra.* As for showing that the proffered reasons were not the real ones, the plaintiff attempted to show that these leadership skills were not needed in GS–13 positions. This attempt ignores the fact that with the reorganization of the office, that the GS–13s were to assume certain duties that had previously been carried out by the GS–12s alone: (1) serving as the acting division head,[30] and (2) training lower rated position classifiers. In addition, they took over special projects, some of which had been performed by the GS–12s and others by the chiefs.

14. Even if the plaintiff had shown that the proffered reasons for the selection were not credible, the plaintiff has not shown that the defendant was motivated by race or sex in making the selections, *i.e.* that the proffered reasons were pretexts for discrimination. See *Clark v. Huntsville City Bd. of Ed., supra,* 717 F.2d at 529, 33 FEP Cases at 18; *White v. Vathally, supra,* 732 F.2d at 1040, 34 FEP Cases at p. 1134; and *Pollard v. Rea Magnet Wire Co.,* 674 F.Supp. 645, 44 FEP Cases 1128, 1139 (N.D.Ind.1986) ("... plaintiff must show not only a false reason, but also a *causal chain in which race or another forbidden criterion plays a dispositive role.*") The plaintiff has offered no direct evidence of racial animus by Mr. Ware, or for that matter by the white supervisors, Mr. Zimmerman and Dr. Mortimer, who

---

**30.** While the performance of these duties is only occasional, it is significant enough for the plaintiff to complain about ("... Cox and Blackwood enjoy job opportunities and privileges denied to the GS–12s, for example, serving as the Acting PCOO Chief on occasion. No opportunity for office supervisory or team leadership experience is afforded plaintiff or the other GS–12s." *Plaintiff's Trial Brief,* p. 11).

reviewed Mr. Ware's decisions.[31] The indirect evidence of background racial animus that Mr. Ware appointed two blacks—Ms. Blackwood to her GS–12 position and Mr. Powell as the Assistant Chief—does not rise to a probative level. There was no evidence to show that either Blackwood or Powell were not the most qualified for the positions selected, and there was no evidence of the racial composition of the pool of applicants from which Blackwood and Powell were selected. The only other evidence of racial animus were the hearsay statements attributed to Cox about Ware—statements never shown to be adopted by Mr. Ware.

Since there is likewise no evidence of sex animus or bias against males,[32] the plaintiff has not shown by a preponderance of the evidence that the reasons offered by the defendant for the selection of Cox and Blackwood were for some other reasons, such as to reward friends, that is not a "pretext *for* discrimination." As noted in *Goostree*, 796 F.2d at 862, 42 FEP Cases at 1160:

> We have recently stressed the difference between a hiring process that proceeds based on legally impermissible distinctions between candidates and a 'patronage system that relies on family, *friends* and political allies.' *Avery v. Jennings*, 786 F.2d 233, 237 (6th Cir.), cert. denied, [477 U.S. 905], 106 S.Ct. 2376 [91 L.Ed.2d 566] (1986). *The defendants are not subject to liability on a Title VII claim if they hired Van Meter based on such criteria not prohibited by Title VII* (Emphasis added).

*Goostree v. State of Tennessee*, 796 F.2d 854, 862, 42 FEP Cases 1154, 1160 (6th

Cir.1986) *cert. denied*, 480 U.S. 918, 107 S.Ct. 1374, 94 L.Ed.2d 689 (1987); *Wrenn v. Gould*, 808 F.2d 493, 503 (6th Cir.1987).

15. Therefore since the plaintiff has not been able to show that the proffered reasons for the selection of Cox and Blackwood were a pretext for discrimination, the plaintiff has failed to carry his burden of proof on his claim of discriminatory selection under Title VII.

### Reprisal Claims

16. The *McDonnell Douglas* sequence of proof for discrimination cases is also applicable to plaintiff's claims of retaliation. *Chen v. GAO*, 821 F.2d 732, 44 FEP Cases 765, 770 (D.C.Cir.1987); *McKenna v. Weinberger*, 729 F.2d 783, 790, 34 FEP Cases 509, 515 (D.C.Cir.1984).

17. Under this order of proof, the petitioner must make out a *prima facie* case of retaliation before the case may proceed and before the employer must make any showing whatsoever. *Chen, supra*, 821 F.2d p. 738, 44 FEP Cases p. 770. To establish a *prima facie* case of retaliation, a plaintiff must show: 1) that he engaged in a statutorily protected activity; 2) that the employer took an adverse personnel action; and 3) that a causal connection existed between the two. *McKenna, supra*, 729 F.2d p. 790, 34 FEP Cases p. 515. Once that prima facie case is made, however, the burden of coming forward shifts to the employer to demonstrate a legitimate non-retaliatory reason for the adverse action against the plaintiff. *Chen, supra*, 821 F.2d p. 738, 44 FEP Cases p. 770. If the employer fulfills that burden, the employee must then come forward and show, by preponderance of the evidence,

---

**31.** The plaintiff instead has offered some evidence that the selectee Ms. Cox made racists comments, and that she predicted future racist behavior by Mr. Ware, but even if credited, this is immaterial, since: (1) Ms. Cox played no role in her or Ms. Blackwood's selection for the GS–13s, (2) she played no role in the selection of the black Assistant Chief, and (3) her role in the actual selection of Mr. Ware was never demonstrated. While she might have carried Mr. Ware's application to the personnel office, this role is best characterized as a deliveryman, a role anyone could have played. Furthermore, there is no evidence indicating that Mr. Ware

even sanctioned or approved of any of Ms. Cox's alleged racist comments.

**32.** As noted above, the allegation that Mr. Ware told the plaintiff in his interview for the GS–13 that he had to pick a female for the GS–13 position was uncorroborated. In this connection, as noted above, the alleged statement was never revealed by the plaintiff at the time of his interviews to the EEO counselor. Furthermore, the only other participant in the conversation denies it occurred (Tr. 470).

that the employer's articulated reason for the allegedly retaliatory action, is pretextual. *Id.* Finally, the employer is permitted one last defense: by clear and convincing evidence the defendant must prove that the plaintiff would have been treated the same way even absent retaliation. *Chen, supra,* 821 F.2d p. 738, 44 FEP Cases p. 770.

■ 18. The plaintiff has failed to make out a *prima facie* case of retaliation with respect to the proposed adverse action issued by Peter J. Watters in May 1984 (Defendant's Ex. U.). Even though it is clear that the plaintiff engaged in protected activity of which the Library of Congress had knowledge (i.e. Slade's original EEO allegations of discrimination dated April 9, 1984), and that he was adversely affected by the notice of proposed adverse action, there was no causal relationship between the two. *Chen, supra,* 821 F.2d p. 738, 44 FEP Cases p. 770. While a causal relationship may be *inferred* when an adverse action closely follows protected activity, (*see Chen, supra,* 821 F.2d p. 738, 44 FEP Cases p. 770), this is overcome by the demonstration of an independent cause for the adverse action. Plaintiff has not presented any evidence that the officials actually investigating and issuing the proposed adverse action knew of the plaintiff's prior complaints. *See* Findings of Fact, *supra,* at par. 38.

19. Even assuming a *prima facie* case has been established, the Library of Congress has shown a legitimate, non-discriminatory reason for the issuance of the proposed adverse action, and that reason has not been shown to be a pretext. It was the policy of the Personnel and Labor Relations Office to restrict access to official files not directly related to an employee's task. The Director had warned employees that violations of this policy would result in disciplinary action. *See* Findings of Fact, *supra,* at par. 36.

20. Therefore, defendant's issuance of a notice of proposed adverse action was not taken in reprisal for the plaintiff's prior complaint of racial discrimination.

21. The plaintiff, likewise, fails to make out a *prima facie* case of reprisal with respect to the delays in the handling of his EEO cases. The plaintiff provided no evidence that anyone in the EEO office had any reason to delay his particular cases or had any animus against him. While Mr. McEwen and the plaintiff had a less than amicable encounter on December 5, 1985, at which point McEwen recused himself, there is no credible evidence that Mr. McEwen played any role in processing plaintiff's case either before or after that date. Thus, the plaintiff fails to demonstrate the causal connection required to establish the third prong of a prima facie case of retaliation. *See Chen and McKenna, supra.*

22. Even if the plaintiff established a prima facie case, the defendant has demonstrated a legitimate non-discriminatory reason for the delay—plaintiff's case was being held up by the same administrative delay that held up all EEO cases at the Library. *See Patterson Report* (Defendant's Ex. II(I), PART 1: Sections 1–4, pp. 111, 119–122).

23. Furthermore, the delays by the EEOC office were shown to be across-the-board, affecting blacks and whites, males and females, not just the plaintiff. *Id.*

24. Thus, plaintiff has failed to show by a preponderance of the evidence that he was retaliated against by the EEOC office or its chief, because he had filed EEO charges or had engaged in a protected activity.[33]

25. As to the plaintiff's claim of retaliation with respect to the investigation and subsequent admonishments issued to Gartmon and Johnson, the plaintiff has again failed to make out a prima facie case of

---

**33.** The operative statutory language in 42 U.S.C.A. sec. 2000e–3 makes it unlawful for an employer to take reprisal "because" of acts of his employees, not because of his own agenda. The plaintiff's theory is that McEwen and Kator delayed the plaintiff's case in order to receive more *favorable* treatment *for Mr. McEwen's own* case does not meet the requirement of retaliation since retaliation by definition requires a form of negative action taken against an employee because of his protected activity.

retaliation. Even though Gartmon and Johnson engaged in protected conduct, in giving their depositions, and even though they were arguably adversely affected by the issuance of the interview letters on February 19, 1987, there was no causal connection between these two. The participants in the issuance of the letters were not aware of the protected activity of Gartmon and Johnson on February 19, 1987. *Jarrell v. Eastern Air Lines, Inc.*, 430 F.Supp. 884, 891; 14 FEP Cases 799, 805 (E.D.Va.1977), *aff'd per curiam*, 577 F.2d 869, 17 FEP Cases 951 (4th Cir.1978) (interviewer who did not hire the complainant was unaware of prior charge filed against); *Downey v. A.H. Belo Corp.*, 402 F.Supp. 1368, 14 FEP Cases 395 (N.D.Tex.1975) (no retaliation where supervisors who reprimanded and discharged plaintiff did not know that plaintiff had filed charge at time of the alleged retaliatory action).

26. Even assuming that the plaintiff has shown a causal connection between the protected deposition testimony of Gartmon and Johnson on February 18–19, 1987 and the issuance of the interview letters on February 19, 1987, the Library has shown a legitimate non-discriminatory reason for issuing the letters to Gartmon and Johnson: their participation in irregularities in signatures on the sign-in/out sheets in PC & O. This reason has not been shown to be pretextual.[34]

27. Therefore, the issuance of the letters of February 19, 1987, to Gartmon and Johnson, was not made in retaliation for their deposition testimony.

28. The same conclusion is reached with regard to the letters of admonishment issued to Gartmon and Johnson: they were but an extension of the investigatory letters and there is no showing that similarly situated employees were treated differently—in fact Mr. Ware, a witness for the defendant, received much more severe discipline than Gartmon and Johnson (Plaintiff's Ex. 286).

29. Plaintiff's final claim of retaliation is with regard to the denial of two (2) hours of court leave to the plaintiff on one day in April, 1987. Even assuming the plaintiff has established a prima facie case of retaliation, the defendant has proferred a legitimate reason for the denial, and the plaintiff has produced no evidence to show that it was a pretext for discrimination.

Accordingly, judgment will be entered for defendant James H. Billington.

**34.** Gartmon and Johnson admitted their participation in the irregularities.